IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

MARGARET CONE,

    *Plaintiff,*                                  Hon.

v.

MARK TESSLER, SHERMAN JACKSON,        Case No.
and DAVID HOWELL,
Jointly and severally,                             JURY TRIAL DEMANDED

    *Defendants*.
_____/

## COMPLAINT

Plaintiff Margaret Cone, through her attorneys Law Office of Peter J. Kelley and Cramer, Minock & Sweeney, P.L.C., for her Complaint, states:

### THE PARTIES, JURISDICTION AND VENUE

1. The Plaintiff is a resident of, and at all times relevant, resided in, Washington, D.C.

2. Defendant Mark Tessler ("Tessler") is a resident of Washtenaw County in the State of Michigan and at all times relevant was employed as Vice Provost for the University of Michigan International Institute.

3. Defendant Sherman Jackson ("Jackson") is an individual residing in the State of California. At all times relevant Jackson was employed at the University of Michigan as a member of the faculty and resided in Washtenaw County in the State of Michigan.

4. Defendant Dave Howell ("Howell") is an individual residing in Washtenaw County in the state of Michigan and at all times relevant was employed as an administrator at Center for Political Studies – Institute of Social Research ("CPS- ISR").

5. The actions giving rise to the claims asserted occurred within Washtenaw County within the Eastern District of Michigan.

6. The amount in controversy exceeds $75,000.00.

## GENERAL ALLEGATIONS

7. Plaintiff incorporates the allegations contained in paragraphs 1-6 above as though fully set forth herein.

8. In 2004, Plaintiff began developing an educational program wherein she envisioned emerging religious scholars and leaders from the Muslim Middle East would learn English, travel to the United States of America, immerse themselves in American culture for a period of time and then attend a major University and enroll in courses alongside their American counterparts; to wit, religious scholars and leaders of the other major monotheistic religions, including Christianity and Judaism. ("The World Leadership Program" or "WLP"). Exhibit 1.

9. Plaintiff secured the participation of al-Azhar University, in Cairo, Egypt through commitments from Sheikh Ahmed al-Tayyeb, the Grand Imam of al-Azhar, to provide the necessary scholars for the WLP.

10. After securing the participation of al Azhar, Plaintiff began her search for a University in the United States.

**A. The University of Michigan and Defendant Sherman Jackson**

11. In March 2008, Plaintiff contacted Defendant Jackson, a faculty member at the University of Michigan International Institute and the founding member of the Board of Trustees of the American Learning Institute for Muslims (ALIM) in Washtenaw County.

12. At that time Jackson expressed interest in hosting the WLP at the University of

2

Michigan.

13. In September 2008, after several discussions, meetings, exchanges of e-mails and proposals between Jackson, Tessler and Plaintiff, the Parties reached an agreement that the University of Michigan International Institute would host the WLP under the faculty direction of Defendant Jackson (the "Contract"). Exhibits 2-9.

14. The Contract, consisting of a series of e-mail communications provided; among other things, that:

    A. Plaintiff would create a non-profit entity "East West Learning Institute" to collect funds and administer the WLP;

    B. Plaintiff would obtain financing for the Program and select the participating students;

    C. The University of Michigan International Institute would host the WLP in the Summer of 2010; and

    D. Jackson would provide curriculum, faculty, and course materials, as well as take on the role of lead professor for the WLP.

Exhibits 2-9.

15. Unbeknownst to Plaintiff, Defendant Jackson had no intention of performing his obligations under the Contract; specifically:

    A. Defendant Jackson had commitments to be overseas in the Summer of 2010;

    B. Defendant Jackson was attempting to secure a tenured position at the University of Southern California ("USC") that would have taken him out of state and conflicted with his ability to perform his obligations under the Contract;

3

      C.      Defendant Jackson did not follow the proper protocol and never obtained the necessary authority to bind the University of Michigan to the Contract; and

      D.      The proper authorities at the University of Michigan had no knowledge of the Contract.

16.    Defendant Jackson knowingly made these false representations with the intent that Plaintiff would act on his representations.

**B. Obtaining Funding for the Program**

17.    In May 2009, in reliance on Defendant Jackson's promises, set forth in the Contract, Plaintiff met with the United Arab Emirates ("UAE") Ambassador to the United States Yousef al-Otaiba (the "UAE Ambassador" or "Ambassador Otaiba") to seek funding and support for the WLP.

18.    In June 2009, Plaintiff traveled to the UAE to meet Sheikh Mohammed bin Zayed al-Nahyan, the crown prince of Abu Dhabi, to present the WLP and for the purpose of obtaining funding.

19.    While in the Middle East, Plaintiff traveled to Egypt, where Defendant Jackson was teaching, introduced Defendant Jackson to Sheikh al-Tayyeb and discussed in greater detail the WLP with the Sheikh and other al-Azhar officials.

20.    At the meeting, Defendant Jackson represented to Plaintiff and Sheikh al-Tayyeb that he would implement the WLP under his faculty direction at the University of Michigan.

21.    On July 17, 2009, Defendant Jackson and Plaintiff met in Ann Arbor, Michigan, to discuss the trip and finalize the WLP's budget.

22.    On July 25, 2009, Plaintiff e-mailed Defendant Jackson the final copy of the WLP proposal and budget, which totaled two million thirty-three thousand, five hundred and ninety

($2,033,590.00) dollars (the "Budget") Exhibit 3.

23. On August 3, 2009, Plaintiff met with Ambassador Otaiba at the UAE Embassy in Washington, D.C. and gave him a copy of the final WLP proposal and budget.

24. On September 6, 2009, Ambassador Otaiba told Plaintiff the UAE would fund the WLP in the full amount of the budget.

25. The proposed timeline for the WLP was for two separate classes for two separate years, as follows:

    A. Class One:

        i. Phase One: January-April 2010 - English Language Instruction in the Middle East

        ii. Phase Two: May-June 2010 – English Language Study at the University of Michigan

        iii. Phase Three: July 2010 – Academic Course Work at the University of Michigan

        iv. Phase Four: Summer 2011 – Weekend Long Distance Learning Course

    B. Class Two:

        i. Phase One: January – April 2011 – English Language Instruction in the Middle East

        ii. Phase Two: May – June 2011 – English Language Study at the University of Michigan

        iii. Phase Three: July 2011 – Academic Course Work at the University of Michigan

      iv.    Phase Four: Summer 2012 - Weekend Long Distance Learning Course

**C. Defendant Tessler Joins the World Leadership Program**

26. After the budget was approved, Defendant Jackson convinced Plaintiff to take on Defendant Tessler as an administrator for the WLP because of his familiarity with University of Michigan protocol for handling project financing.

27. On October 7, 2009, Plaintiff and Defendant Jackson met in Washington, D.C. where Plaintiff informed Defendant Jackson the UAE agreed to fund the WLP budget and Defendant Jackson told Plaintiff to direct the UAE Ambassador to communicate with Defendant Tessler regarding payment.

28. On November 1, 2009, Ambassador Otaiba faxed a letter to Defendant Tessler stating that he approved the budget submitted by Plaintiff and that the UAE government was contributing two million thirty-three thousand, five hundred and ninety dollars ($2,033,590.00) to the University of Michigan to fund the WLP (the "WLP Funds"). Exhibit 4.

29. In his letter, Ambassador Otaiba specifically restricted the spending of the WLP Funds to the approved budget. The WLP Funds were "contingent upon the money being spent in accordance with the budget that had been submitted by" Plaintiff.

30. On December 1, 2009, Defendant Tessler and Jackson sent a letter to Ambassador Otaiba, using stationary with the letterhead of the University of Michigan Vice Provost of International Affairs and University of Michigan International Institute, reaffirming their obligations under the Contract and requesting the WLP Funds be wired to a Bank of America account. Exhibit 5.

31. On December 14, 2009, using University of Michigan Vice Provost of

6

International Affairs and University of Michigan International Institute letterhead, Defendants Tessler and Jackson sent a letter to Sheikh al-Tayyeb stating that they would "oversee the programing and operations" for the WLP beginning in January 2010. Exhibit 6.

32.     Once receiving confirmation that the WLP budget would be funded in whole by the UAE, Plaintiff traveled to Egypt to select the students that would take part in the WLP and prepare them for their trip to the United States and the University of Michigan.

33.     Plaintiff was in Egypt from December 5, 2009 - January 10, 2010, January 19 - February 14, 2010, and March 22 - April 12, 2010.

34.     In December 2009, Plaintiff and al-Azhar officials selected sixteen (16) al-Azhar graduate students and teaching assistants, both men and women, from the faculties of Islamic theology, law, religious texts, and literature (the "Participants").

35.     On January 15, 2010, Defendants Tessler and Jackson sent a letter to Ambassador Otaiba committing to the implementation schedule of WLP:

> We are pleased to report that we have made significant progress in our planning and in participant selection. We are now ready to commit to a timeline and need to make reservations and travel plans for the participants. For this reason, we would like to provide you with the following wiring instructions so that your contribution of $2,033,590 can be transferred.

Exhibit 7.

36.     Unbeknownst to Plaintiff, the bank account receiving the WLP Funds was owned and managed by CPS-ISR, a separate entity from the University of Michigan International Institute, under the administrative control of Defendant Howell.

37. Defendants Tessler and Jackson assured the Ambassador that "all project expenditures will be carefully monitored according to the well-established financial policies and procedures at the University of Michigan". Exhibit 7.

38. After the Budget was approved, Defendant Jackson represented to Plaintiff that the University of Michigan, for the sum of $500,000.00, would take on certain duties it previously was not responsible for; including, expenses related to staffing and administering the program.

39. The $500,000.00 expense was not in the original and approved Budget; however, according to Defendant Jackson, "with UM involved, everything would be taken care of – [we] just [have] to show up."

### D. Defendant Howell Joins the Program

40. Defendant Jackson introduced Plaintiff to Defendant Howell, whom Defendant Jackson held out as a qualified administrator and who would be able to administer the WLP at the University of Michigan.

41. Defendant Jackson did not disclose to Plaintiff that Defendant Howell had never administered international programs or that Defendant Howell had overseas obligations and planned absences from Ann Arbor between January 2010 and June 2010 that would prevent him from administering the WLP program.

42. While Plaintiff was in Egypt, she was dependent on people at the University of Michigan to manage the program in the United States. Unfortunately, throughout those periods Defendants Tessler, Jackson and Howell were travelling extensively and not available. Plaintiff received no administrative support whatsoever.

8

43. Plaintiff found herself responsible for doing all of the work herself; that is, enrolling the students in an English language course at the University of Michigan, hiring faculty for the July conference, arranging airline flights, housing and meals, securing passports and visas for the al-Azhar students, recruiting the American participants and handling administrative paperwork.

**E. Center for Political Studies – Institute of Social Research (CPS-ISR)**

44. When questioned about the complete lack of cooperation and administrative help, Defendant Jackson informed Plaintiff there were unspecified "problems" with University of Michigan International Institute and the WLP needed to be moved to CPS-ISR.

45. Specifically, as Plaintiff later learned, those problems included:

   A. The University of Michigan International Institute never agreed to host the WLP, never had room for the WLP, and the individuals with authority to bind the International Institute were neither consulted nor had they ever heard of the WLP and Margaret Cone.

   B. CPS-ISR had always been the planned administrative home for the WLP.

   C. Defendants Tessler and Howell had administrative control at the CPS-ISR and the WLP Funds were already deposited into a CPS-ISR bank account.

46. CPS-ISR although loosely associated with the University of Michigan is a self-funded and self-administered research center.

47. The existence of, and Defendants' use of, the WLP Funds was consequently not reported through ordinary University of Michigan administrative protocol.

48. Defendant Howell, without consulting Plaintiff, allocated $400,000.00 for

9

Defendants Tessler and Jackson in "Research Salaries" and fringe benefits and $507,500.00 in fees for CPS-ISR.

49.   Defendant Howell's allocations violated the approved Budget and the terms of Defendants' Contract with Plaintiff.

50.   In late March of 2010, Plaintiff learned that in addition to Defendants intentional misrepresentations that the University of Michigan International Institute would host the WLP, Defendants Jackson, Tessler and Howell never had any intention of carrying out their obligations under the Contract; specifically:

    A.   Defendant Tessler was on a previously undisclosed sabbatical leave beginning in January 2010 and, under UM policy, was prohibited from accepting any assignment.

    B.   Defendant Jackson had committed to teaching in Egypt and attending several overseas conferences before May, 2010 and July, 2010. He was also actively negotiating a new job with University of Southern California with the intention of moving in July.

    C.   Defendant Howell was aware of his extensive overseas commitments, his planned absences from Ann Arbor beginning before January, 2010 and June, 2010 and knew that those commitments would have prevented him from providing the administrative attention the WLP required.

**F.  Plaintiff's Efforts to Mitigate Defendant's Breach of Contract.**

51.   On March 11, 2010, Plaintiff e-mailed Defendants Jackson and Howell:

I have been giving our arrangement a lot of thought and wonder if we have the right structure in place for the project. I raised similar concerns in January as to

whether we had the structure to support what is essentially a "start up" and all that entails. I am completely overloaded and it is getting worse. This does not make any sense. Since December, I have focused exclusively on this project with the idea I would be able to pass off much of the day to day time consuming but crucial aspects of the project once u of m was on board. Since December, I've been putting in over 70-hour workweek's plus extensive foreign travel and practically living in Egypt. I get phone calls from Egypt beginning at 4 am. We need to think this through and whether we have the right structure in place. This project is going to become more intense and with more moving parts very soon. I have deep concerns.

52. Plaintiff e-mailed a reminder to Defendants Jackson and Howell as well as the CPS-ISR staff that the al-Azhar students were scheduled to arrive in Ann Arbor the first week of May 2010 and then left for Egypt on Sunday, March 21, 2010 to facilitate the visa process with the U.S. Embassy.

53. The WLP staff in Egypt filled out University of Michigan forms for the al-Azhar students and e-mailed this information along with the necessary documentation and photographs to Defendant Howell and CPS-ISR staff.

54. CPS-ISR staff was instructed to enter the information into the U.S. Department of Homeland Security database.

55. On Thursday morning, March 25, 2010, Plaintiff e-mailed Defendants Jackson and Howell and CPS-ISR staff about the status of the visa applications but did not receive a response.

56. The following evening, Friday, March 26, 2010, Defendant Jackson emailed a file purporting to contain the completed visa applications; the file had been given to Defendant Jackson by Defendant Howell.

57. The student visa application forms were not on the emailed file. Plaintiff emailed Defendant Jackson and CPS-ISR staff but received no response.

58. On Sunday, March 28, 2010, Plaintiff met with a U.S. Embassy official who told

11

her it was too late to complete the student visa process, but she should contact the Deputy Chief of Mission to see if the al-Azhar students might be eligible for another type of visa.

59.     The next day, the U.S. Embassy's General Counsel and the Head of Bureau of Consulate Affairs recommended that the students obtain B1/B2 travel visas and began working with WLP staff over the next ten (10) days to complete the visa application process.

60.     After resolving the issue with the Visas, Plaintiff e-mailed Defendant Tessler and Jackson requesting they identity the services CPS-ISR was providing for the $500,000 fee.

61.     Plaintiff did not receive a response addressing her concerns, instead she received an email from Defendant Jackson informing Plaintiff he had scheduled himself to be either out of the Country or out of the State in May and June, that he was accepting a position at University of Southern California and was moving to Los Angeles in July 2010.

62.     Defendant Jackson advised Plaintiff he would be available to oversee the two-week conference in July; however, he had neither prepared curriculum nor hired faculty for the WLP conference.

63.     Plaintiff hired outside scholars, a scholar in comparative Islam and Judaism and a scholar in religious studies, to develop the curriculum for the July conference and she prepared a list of suitable faculty for approval by Defendant Jackson.

64.     Defendant Jackson recommended that she ask Defendant Tessler for suggestions.

65.     On April 11, 2010, Plaintiff learned Defendant Jackson was unavailable to carry out his duties as faculty director for the two-week conference in July, 2010.

66.     When Plaintiff e-mailed Defendant Tessler that Defendant Jackson was moving to USC in the summer and asked what the implications were for the WLP, Defendant Tessler expressed surprise. He stated that he "couldn't provide leadership" on the WLP.

67. Defendant Tessler acknowledged that he knew of no arrangements to secure faculty to fill the void created by Defendant Jackson's absence and told Plaintiff that he would speak with Defendant Jackson when he returns to Ann Arbor on April 19, 2010.

68. Plaintiff made inquiries to other University of Michigan officials in an effort to secure faculty to direct the WLP, discovered that the WLP was not on the University of Michigan official schedule of events and no one from the University of Michigan knew about the WLP or the WLP Funds.

69. Specifically, she learned:

    A. Defendants Tessler, Jackson, Burns and Howell had not followed University of Michigan rules and procedures in processing the WLP and its funds.

    B. Jerry May the University of Michigan Vice President of Development said that he had no control over the WLP Funds, the WLP "was not a University of Michigan project" and that it would be exceedingly difficult to move the program to another department at University of Michigan.

    C. The WLP was not a University of Michigan project and Defendants had routed the WLP Funds into a CPS-ISR bank account, not an account operated by the University of Michigan.

    D. Defendant Tessler lacked authority to accept the WLP Funds while he was on sabbatical; and

    E. Neither the University of Michigan International Institute, nor any other division at the University would have sufficient time to prepare for the al-Azhar students' arrival in two weeks.

70. None of the Defendants would be in Ann Arbor to oversee the WLP and no one

else from the University of Michigan or CPS-ISR would be available to oversee the WLP.

### G. Plaintiff Moves the Program to Georgetown University and Seeks Return of the WLP Funds.

71.     In the end of April, 2010, an al-Azhar official told Plaintiff that Defendant Jackson sent a letter to al-Azhar notifying it that the University of Michigan had abandoned the program, the University of Michigan would not be responsible for the al-Azhar students and recommended that the program be cancelled.

72.     Plaintiff and al-Azhar officials decided it would be appropriate to move the July portion of the program to some other university and ultimately settled on Georgetown University, which agreed to host the July conference for the WLP.

73.     Plaintiff arranged for and successfully implemented the nine-week English language portion of the WLP in Ann Arbor, without any assistance from Defendants or the University of Michigan.

74.     On June 9, 2010, Plaintiff met with Ambassador Otaiba at the UAE Embassy in Washington, D.C.

75.     Ambassador Otaiba requested that Plaintiff ask the Defendants to return the WLP Funds without delay, and accordingly, Plaintiff e-mailed Defendant Tessler and relayed Ambassador Otaiba's request.

76.     A week later, on June 16, 2010, Defendant Tessler e-mailed Plaintiff and Ambassador Otaiba for wiring instructions and claimed that the delay in returning the WLP Funds was due to outside vendors.

77.     On July 2, 2010, the al-Azhar students left Ann Arbor and traveled to Washington, D.C. to attend a two-week conference at Georgetown University. Defendants Tessler, Burns and Howell still had not returned the UAE funds urgently needed by Plaintiff to run the program.

14

78. On July 13, 2010, Defendants transferred the WLP Funds to UAE Embassy bank account in Washington, D.C., after keeping approximately $820,000.00 in fees, for doing absolutely no work.

79. Despite the set-backs, Plaintiff met UAE Embassy staff in October 2010 to discuss implementing a second year of the WLP, hosting the entire WLP in Georgetown, and to deliver her invoice for costs and expenses she incurred in implementing the Program.

80. Plaintiff spent out-of-pocket the sum of $438,155.68.

81. The UAE decided not to fund a second year of the WLP.

82. On February 22, 2011, Plaintiff learned the UAE would not reimburse Plaintiff for her out-of-pocket costs associated with the WLP.

83. The UAE conceded that the WLP expenses, although legitimate had already been paid to Defendants, from whom she should seek repayment.

## COUNT I – BREACH OF CONTRACT

84. Plaintiff incorporates the allegations contained in paragraphs 1-83 above as though fully set forth herein.

85. Plaintiff and Defendant entered into a Contract, set forth in a series of email communications wherein the Parties agreed, among other things, that:

    A. Plaintiff would obtain financing for the Program and select the participating students;

    B. Plaintiff would create a non-profit entity "East West Learning Institute" to collect funds and administer the World Leadership Program;

    C. The University of Michigan would host the WLP in the Summer of 2010; and

    D. Jackson would provide curriculum and staffing as well as take on the role

of lead professor for the WLP.

86. Plaintiff performed her obligations under the Contract.

87. Defendants Jackson, Tessler and Howell failed and refused to perform their obligations under the Contract:

    A. Defendants Jackson and Tessler failed to secure a facility at the University of Michigan, or elsewhere, to host the WLP,

    B. Defendants Jackson and Tessler failed to provide faculty for the WLP,

    C. Defendants Jackson and Tessler failed to prepare curriculum for the WLP,

    D. Defendant Jackson failed to attend and perform the role of lead professor

    E. Defendants Jackson, Tessler and Howell failed to provide administrative support for the WLP, and

    F. Jackson, Tessler and Howell misallocated WLP Funds.

88. As a result of Defendants' failures to perform their obligations under the Contract, Plaintiff was damaged in the amount of $438,155.68 in out of pocket expenses, $300,000.00 in expected profits from the first year of the WLP and in excess of $1,200,000.00 in loss of reputation and loss of expected profits from subsequent years' Programs funded by the UAE.

## COUNT II – FRAUDULENT MISREPRESENTATIONS

89. Plaintiff incorporates the allegations contained in paragraphs 1-88 above as though fully set forth herein.

90. Defendants Tessler and Jackson represented to the WLP, al-Azhar, the UAE, and the Clinton Global Initiative that the International Institute at the University of Michigan would host the WLP under Defendant Jackson's direction, that they would provide faculty, curriculum, classroom space, course materials and administrative staff for the WLP.

91. Defendants representations in paragraph 90 above were false, and Defendants knew they were false when they were made; specifically, Defendants had no intention of hosting the WLP at the University of Michigan International Institute:

    A. Defendants did not follow University of Michigan rules and procedures in processing the WLP Funds.

    B. Defendant Jackson did not inform the University of Michigan department of grant management about the WLP Funds nor did he inform the chair of the academic unit where he was tenured.

    C. The University of Michigan International Institute never agreed to host the WLP and the individuals with authority to bind the International Institute were neither consulted nor had they ever heard of the WLP and/or Plaintiff Margaret Cone.

    D. Instead of placing the WLP Funds into an account under the control of the International Institute at the University of Michigan, Defendants deposited the WLP Funds into an account under the control of CPS-ISR.

92. Defendants representations in paragraph 90 above were false, and Defendants knew they were false when they were made; specifically, Defendants would not be in Ann Arbor during the time frame required to implement the WLP; to wit, January 2010 through July 2010 and had other commitments that conflicted with their obligations to the WLP:

    A. Defendant Tessler was on a previously undisclosed sabbatical leave beginning in January 2010, and under University of Michigan policy, he was prohibited from accepting any assignments.

    B. Defendant Jackson was committed to teaching in Egypt and attending several overseas conferences in May 2010 through July 2010.

  C. Defendant Jackson was actively negotiating a new job at the University of Southern California and planning to move to California.

  D. Defendant Howell had extensive overseas obligations and planned absences from Ann Arbor between January 2010 and June 2010 and knew those commitments would have prevented him from providing the administrative attention the WLP required.

93. Defendants representations in paragraph 90 above were false, and Defendants knew they were false when they were made; specifically, Defendants Tessler and Jackson did not have requisite authority under University of Michigan rules and procedures to negotiate a contractual relationship on behalf of the University of Michigan accept the WLP Funds on behalf of the University of Michigan.

94. Defendants made the representations set forth in paragraph 90 above with the expectation that Plaintiff would rely on them, obtain funding for the WLP and deliver the WLP Funds to a bank account under Defendants' control.

95. Plaintiff relied on Defendants' representations, pursued funding for the WLP from the UAE, obtained the WLP WLP Funds from the UAE in excess of $2,000,000.00 and directed the UAE to wire the WLP Funds to Defendants.

  A. Plaintiff would not have directed the UAE to wire the WLP Funds to Defendants if she had known Defendants Tessler and Jackson were not available to implement the program.

  B. Plaintiff would not have directed the UAE to wire the WLP Funds to Defendants if she had known the International Institute at University of Michigan was not hosting the WLP.

96. Plaintiff's reliance on Defendants' false representations permanently damaged her relationship with al-Azhar and the UAE and ended any chance of further cooperation from al-Azhar and/or funding opportunities with the UAE.

97. As a result of Plaintiff's reliance on Defendants' false representations, Plaintiff was damaged in the amount of $438,155.68 in out of pocket expenses, $300,000.00 in expected profits from the 2010 Program and in excess of $1,200,000.00 in loss of reputation and loss of expected profits from subsequent years' Programs funded by the UAE.

## COUNT III –PROMISSORY ESTOPPEL

98. Plaintiff incorporates the allegations contained in paragraphs 1-97 above as though fully set forth herein.

99. Defendants Jackson, Tessler and Howell promised to host the WLP at the University of Michigan International Institute under the faculty direction of Defendant Jackson, that they would provide faculty, curriculum, classroom space, course materials and administrative staff for the WLP.

100. In reliance on Defendants' promises Plaintiff sought and obtained the WLP Funds in the amount of $2,033,590.00 from the UAE.

101. Defendants never performed their promises, kept in excess of $820,000.00 of the WLP Funds and then returned the remaining Funds, approximately $1,200,000.00, to the UAE.

102. As a result of Defendants' failure to host the WLP, provide administrative support, faculty, curriculum and to properly administer the WLP Funds in their possession, Plaintiff suffered damages in the amount of $438,155.68 in out of pocket expenses, in excess of $300,000.00 in expected profits from the 2010 Program, and in excess of $1,200,000.00 in loss of reputation and loss of expected profits from subsequent years' Programs funded by the UAE.

103. Defendants will be unjustly enriched if they are allowed to keep the $820,053.00 despite their failure to perform any of their promises.

WHERFORE, Plaintiff respectfully requests this Court enter an order granting the relief requested in her Complaint and entering a judgment against Defendants, jointly and severally, in favor of Plaintiff in the sum of $1,938,155.68, awarding Plaintiff her reasonable attorney fees and costs associated with this action and granting such other relief as this Court deems just and equitable.

Respectfully Submitted,

LAW OFFICE OF PETER J. KELLEY

/s/ Peter Kelley, w/ permission
Peter J. Kelley (P13925)
Attorney for Plaintiff
122 S. Main Street, Suite 370
Ann Arbor, MI 48104
(734) 668-1344
pkelleylaw@aol.com

CRAMER, MINOCK & SWEENEY, P.L.C.

/s/ Ryan Sweeney
Ryan Sweeney (P70459)
Attorney for Plaintiff
339 East Liberty Street, Suite 200
Ann Arbor, MI 48104
(734) 668-2200 telephone
(734) 668-0416 facsimile
rsweeney@cramerminock.com

Dated April 8, 2016