# EXHIBIT 2

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                FOR THE EASTERN DISTRICT OF MICHIGAN
 3
 4   MARGARET CONE,
 5                                    Case No. 2:16-cv-11306
 6        Plaintiff,                  Hon. Sean F. Cox
 7   vs.                              Mag. Judge Stephanie D. Davis
 8
 9   MARK TESSLER, SHERMAN JACKSON,
10   and DAVID HOWELL,
11   jointly and severally,
12
13        Defendants.
14
15
16                     VIDEOTAPED DEPOSITION
17
18   DEPONENT:   SHERMAN A. JACKSON - NON-CONFIDENTIAL PORTION
19   DATE:       Monday, October 9, 2017
20   TIME:       9:27 a.m.
21   LOCATION:   Hooper Hathaway, P.C.
22               126 S. Main Street
23               Ann Arbor, Michigan
24   REPORTER:   Elizabeth G. LaBarge, CSR-4467
25   JOB NO:     5380
```

### Page 50

1   THE WITNESS: I'm sorry. I apologize.
2   BY MR. JUCKNIESS:
3   Q   And I should have said at the beginning, if you want to
4       take a break at any time, just let us know.
5       When did you first meet with Mark Tessler about the
6       World Leadership Program?
7   A   I don't know the dates.
8   Q   Do you remember the year?
9   A   I believe it was 2008, I believe.
10  Q   And why did you meet with -- how did you know Mark
11      Tessler at the time?
12  A   Well, he is a professor here and he's also a
13      vice-provost and the --
14  Q   Provost for?
15  A   He's vice-provost in the university and a director of
16      the International Institute, and he and I had actually
17      sat on panels together about the Middle East. I had
18      seen him lecture around the university on the Middle
19      East and we got to know each other in that capacity.
20  Q   And did you approach him then with respect to the World
21      Leadership Program?
22  A   Yes.
23  Q   And why did you approach him?
24  A   Because I felt that -- two things: One, with regard to
25      any regulations with regard to the acceptance of

### Page 51

1       programs like this, that as a vice-provost, he would be
2       the person who could best assure that everything would
3       be okay; and then, two, that he had familiarity with the
4       Middle East and he was very sympathetic to Middle
5       Eastern students and so in terms of the crafting of the
6       program as things went forth, he would be amenable to
7       respond in ways that would be most facilitating for the
8       program.
9   Q   Okay. And --
10  A   And he was head of the International Institute, so that
11      was a possible -- a possible home.
12  Q   Okay. And in fact, you discussed the International
13      Institute as the possible home at the University of
14      Michigan with Ms. Cone, as well, correct?
15  A   I believe so, yes.
16  Q   And the International Institute would have in your mind
17      made a proper home for the project for what reason?
18  A   According to my understanding at the time, because
19      it -- my understanding at the time was that it had
20      infrastructure.
21  Q   Okay. And at that time, 2008, 2009, had you done any
22      projects with CPS?
23  A   No.
24  Q   And what is CPS?
25  A   As far as I understand, the Center for Political

### Page 52

1       Studies.
2   Q   Okay. And -- and is CPS part of another entity?
3   A   I can't say for sure.
4   Q   Okay. Do you know, is it part of the U of M?
5   A   That was my understanding at the time, but I can't say
6       that for sure now either.
7   Q   Did you know one way or another at the time whether or
8       not CPS was controlled by the University of Michigan?
9   A   I assumed it was.
10  Q   Okay. And did you later learn that that was not
11      entirely accurate?
12  A   Not until this came out.
13  Q   Okay. And what did you learn?
14  A   Well, just what was in the Complaint.
15  Q   So as a professor at the University of Michigan, what
16      was your understanding of what was required to get
17      approval for a project to be housed at the University of
18      Michigan?
19  A   Well, I didn't have a clear understanding, and this is
20      one of the reasons why I turned to Mark Tessler, because
21      I felt that being in the position that he is in as a
22      vice-provost, he would have that understanding and that
23      understanding would be acted upon.
24  Q   And did you recommend that he be the principal
25      investigator instead of you?

### Page 53

1   A   I -- I faintly recall a conversation, but I can't commit
2       to an answer on that one way or another.
3   Q   In fact, you took on the role as principal investigator,
4       correct?
5   A   Yes, I believe, yes.
6   Q   And what is principal investigator?
7   A   Basically, overseer of the project and the one who
8       ensures that it's consistent with its description and
9       budgetary dictates.
10  Q   Um-hmm. And what approvals are required for you to
11      become principal investigator on a sponsored project?
12  A   I'm not sure.
13  Q   Did you have any idea of what those obligations were at
14      the time?
15  A   I'm not sure.
16  Q   You don't recall one way or the other?
17  A   I have -- I had a general idea, but I don't recall
18      consulting any regulations on principal investigators.
19  Q   You did produce a professor's handbook of regulations in
20      this case. Did you review that in connection with your
21      role as principal investigator?
22  A   No.
23  Q   And so did you know what approvals were required in
24      order to make an agreement on behalf of the university?
25  A   No.

**Page 86**

1  Q   Okay. And do you have an explanation then as to why the
2      effort reporting that we just went through is
3      inaccurate?
4  A   Well, again, only just what I just said --
5  Q   Okay.
6  A   -- about my summer -- my summer compensation was not
7      based on any particular obligations I had to the
8      university, so I'm not obligated to teach or serve in
9      any administrative capacity.
10 Q   You have 75 percent effort available for other things
11     during the summer, is that correct?
12 A   No. What I'm saying is that I have zero obligation to
13     the university, in my understanding, over the summer.
14 Q   You have a 25 percent obligation to the law school for
15     each month of the 12-month period, is that correct?
16 A   No. My understanding is that my twenty -- and I may be
17     understanding this incorrectly, but my understanding is
18     that my 25 percent to the law school is divided into
19     course obligations. I'm required to offer three courses
20     to LS&A and one course to the law school, but that
21     occurs over the nine or ten-month -- nine-month semester
22     calendar for the year. During the summer, I don't have
23     any obligation to the law school and I don't have any
24     obligation to LS&A.
25 Q   So what percentage effort do you have available to

**Page 87**

1      dedicate to any program during -- or did you have
2      available to dedicate to a program during the summer of
3      2009 or 2010?
4  A   Well, again, I'm not on the clock, so I could do -- I
5      could -- I don't know how that would be calculated,
6      that's my point.
7  Q   Okay. And you didn't ask your boss at the LS&A --
8  A   No.
9  Q   -- how you'd calculate that?
10 A   No, I did not.
11 Q   Who was your boss at the LS&A?
12 A   At that time, I think it was Michael Bonner.
13 Q   And what was his position or --
14 A   Chair.
15 Q   -- title?
16 A   He was chair of Near Eastern Studies.
17 Q   And who was the dean --
18     COURT REPORTER: I'm sorry. Of?
19 A   Chair of Near Eastern Studies.
20     COURT REPORTER: Thank you.
21 BY MR. JUCKNIESS:
22 Q   And who was the dean of LS&A?
23 A   I believe at the time, it was, I believe, Terry
24     McDonald, but I might not have that right.
25 Q   So -- and we'll come back to that, but back on the

**Page 88**

1      effort reporting then, during the cal -- during the
2      school year, from September to May, what percentage
3      effort did you have available to dedicate to other
4      projects?
5  A   Again, whatever I could arrange personally as long as I
6      fulfilled my obligations to the university.
7  Q   And anything that you arranged personally then, you did
8      as an independent contractor and not as an employee?
9  A   Not necessarily. If I went and gave a lecture, yes, I
10     guess they would pay me as a -- as an independent
11     contractor.
12 Q   Okay. Were you paid as an independent contractor by
13     Seton Hall?
14 A   Actually, I was paid as, I think, an employee of Seton
15     Hall. I think. I am not -- I'm not 100 percent sure of
16     the arrangement.
17 Q   And were you paid as an employee or as an independent
18     contractor by the World Leadership Program?
19 A   My understanding is I was paid as an employee.
20 Q   As an employee of what?
21 A   University of Michigan.
22 Q   What department of the University of Michigan?
23 A   I'm not sure.
24 Q   What department did you --
25 A   Oh.

**Page 89**

1  Q   -- were you approved --
2  A   Strike that. I -- I elected to be paid under my law
3      school commitment.
4  Q   You elected to be paid under your law school commitment?
5  A   Yes.
6  Q   And that was because your law school commitment paid
7      more money than your LS&A?
8  A   Actually, it paid less.
9  Q   It paid less. And then that was because you had more
10     effort available? Why under your law school commitment
11     instead of your LS&A commitment?
12 A   Because as I said, that the law school commitment turned
13     out to be less money taken from the -- in other words,
14     I'd be paid less money. I was trying not to be --
15 Q   Greedy?
16 A   Okay.
17 Q   And were you paid by the law school?
18 A   In terms of?
19 Q   By the -- in connection with the World Leadership
20     Program?
21 A   I don't know what the arrange -- what the backstage
22     arrangements were. When I was approached and asked to
23     be -- asked to submit what arrangement under which I
24     would be paid, I said my law school salary.
25 Q   And you didn't get any approval from your boss at the

### Page 104

1  MR. BOURQUE: Why don't we take a really quick
2  break --
3  MR. JUCKNIESS: Yeah, we'll take a break --
4  MR. BOURQUE: -- it's 11:35.
5  MR. JUCKNIESS: -- we've been --
6  THE WITNESS: Just a throat lozenge --
7  MR. JUCKNIESS: No, we don't have to get -- it's
8  fine. Let's go off and we can take a break.
9  VIDEOGRAPHER: The time is 11:34 a.m. We are now
10  off the record.
11  (Whereupon a break was taken.)
12  VIDEOGRAPHER: The time is 11:42 a.m. We are now
13  on the record.
14  BY MR. JUCKNIESS:
15  Q  In connection with your -- in connection with your
16  conversations with Margaret Cone in 2009 in preparing
17  for the World Leadership Program, it's your testimony
18  that you were only acting on behalf of the University of
19  Michigan and not on behalf of yourself as an independent
20  contractor?
21  A  Yes, I was -- I was pursuing the possibility of the
22  University of Michigan housing or hosting this project,
23  and that was in my capacity as an employee of the
24  University of Michigan. I didn't understand any reason
25  why she would be coming to me other than that.

### Page 105

1  Q  And you were acting on behalf of the U of M LS&A school?
2  A  Well, I'm not sure in behalf, but I -- I was an employee
3  of the University of Michigan. And so I was -- I
4  was -- I was proceeding as an employee of the University
5  of Michigan. I assume that that's the capacity in which
6  Mark Tessler had conversations with me.
7  Q  And then you were paid as an employee of CPS?
8  A  I don't know how I was paid. I mean, I assume that,
9  based on what we just saw.
10  Q  And who at the university confirmed that with respect to
11  the WLP, you were acting on behalf of the University of
12  Michigan with respect to that project?
13  A  I don't know.
14  Q  Did anybody?
15  A  I don't know.
16  Q  You don't recall anybody confirming that you had
17  properly acted on behalf of the University of Michigan?
18  A  I don't know.
19  Q  Who's your current boss?
20  A  The dean?
21  Q  Yeah, at USC.
22  A  April Miller.
23  Q  April Miller, that's who you report to?
24  A  Well, I report to my chair.
25  Q  Okay. Who's your chair?

### Page 106

1  A  Lisa Bitel.
2  Q  How do you spell that last name?
3  A  B-i-t-e-l.
4  Q  And did you talk to her about the World Leadership
5  Program at any time?
6  A  No, I did not.
7  Q  Did you talk to her about this deposition?
8  A  No, I did not.
9  Q  Does anyone at USC know you're here for this deposition?
10  A  I don't think so.
11  (Exhibit 5 was marked for identification.)
12  BY MR. JUCKNIESS:
13  Q  I'm handing you what's been marked as Exhibit 5. This
14  is U-M Subpoena Response 2454 through 2465 and this is a
15  project approval form attachment, and if you flip
16  through this collection of documents, and we'll go into
17  some of them in more detail, but let me ask, do you
18  recall certifying a set of documents like this with
19  respect to requested approval for the World Leadership
20  Program at the University of Michigan?
21  A  I don't understand your question. Certify with whom?
22  Q  With the University of Michigan?
23  A  How would that -- so submitting a request for
24  certification or --
25  Q  For a project approval form?

### Page 107

1  A  I don't recall that, no.
2  Q  Do you know what a project approval form is?
3  A  Well, I know what I saw this morning.
4  Q  You know the principal investigator is responsible for
5  the project approval form?
6  A  I did not know that.
7  Q  Did you know that the principal investigator is
8  responsible for ensuring the accuracy of the information
9  in the project approval form?
10  A  I did not know that.
11  Q  Did you ever try to ensure the accuracy of any project
12  approval form?
13  A  I didn't -- I wasn't aware that project approval forms
14  were being generated.
15  Q  Okay. So this document, you'll see it lists off a
16  variety of proposal documents, PAF documents, and then
17  award documents, do you see those categories?
18  A  PAF?
19  Q  Um-hmm. And then it says "Proposal Documents"?
20  A  Okay.
21  Q  And it says "ProposalNoteForPAF"?
22  A  "ProposalNoteForPAF," uh-huh.
23  Q  And then underneath that, it lists other documents, but
24  let's just go to the proposal.
25  Was there a World Leadership Program proposal that

Page 120

1 rules.
2 Q  As the PI on the project, you understood it was your
3    obligation to ensure that the money was spent in
4    accordance with the budget as agreed?
5 A  Yes, basically. But there were two issues. One,
6    that -- my understanding was that it was agreed that the
7    budget would have to be adjusted, and I think that even
8    Ms. Cone agreed to that. I'm not saying she agreed to
9    the specifics, but that there would be certain
10   adjustments. And that whatever was agreed upon then
11   would be passed through university procedures, and that
12   would ensure that everything was okay.
13 Q  And who was responsible for passing the adjustments
14   through university procedures?
15 A  I would assume CPS.
16 Q  And who at CPS?
17 A  I would assume either David Howell or Nancy Burns.
18 Q  Not Mark Tessler?
19 A  I'm not -- I don't -- I'm not sure that Mark Tessler
20   would have had very much to do with that at CPS, I'm not
21   sure, I don't know.
22 Q  Did you have an understanding that Mark Tessler was on
23   sabbatical or educational --
24 A  I did not.
25 Q  -- leave at the time?

Page 121

1 A  I did not.
2 Q  He didn't tell you that?
3 A  I don't recall him telling me that or his --
4 Q  Do you know that now?
5 A  Well, yes, I read the Complaint, yes.
6 Q  Do you have an understanding of what time he had
7    available to work on the project, given his leave
8    status?
9 A  As I said, I didn't know that at the time, so --.
10 Q  Do you have an understanding now as to what time he
11   would have available to work on the project?
12 A  No, I don't.
13 Q  How much time did you expect him to work on the project?
14 A  I couldn't quantify it. But again, part of the reason I
15   couldn't quantify it was because the kind of
16   conversations that were had about what the project would
17   ultimately entail were still in a state of evolving.
18 Q  Okay. And after they evolved, what were Tessler's
19   duties with respect to the project?
20 A  In my understanding, that Tessler was going to be among
21   the teachers.
22 Q  Okay. Anything else?
23 A  I can't recall in full, no.
24 Q  Was he a co-PI?
25 A  Oh. Yes.

Page 122

1 Q  So he was also --
2 A  In my understanding, yes.
3 Q  He was also responsible with -- along with you to ensure
4    that the money was spent in accordance with --
5 A  Yes.
6 Q  -- the budget?
7 A  Yes.
8 Q  Do you know if he was acting as an employee or an
9    independent contractor?
10 A  I assume as an employee.
11 Q  And it was part of his effort reporting?
12     COURT REPORTER: I'm sorry, what was that?
13 BY MR. JUCKNIESS:
14 Q  And it was part of his effort reporting?
15 A  I don't know.
16 Q  Well, it would have to be if he was acting as an
17   employee, right?
18     MR. BOURQUE: Objection to the form, presumes facts
19   not in evidence.
20     Go ahead.
21 BY MR. JUCKNIESS:
22 Q  If you know.
23 A  I don't know.
24 Q  Okay. Let me have you turn to 2457, it's the next page.
25 A  Um-hmm.

Page 123

1 Q  Did you prepare this budget?
2 A  I don't recall preparing this.
3 Q  Do you recall approving this budget?
4 A  This budget, certainly based on the bottom line, looks
5    consistent with the budget that was basically drawn up
6    by Ms. Cone, so I think that something along this order
7    was generally understood to be the budget, but I don't
8    recall drawing up these specifics.
9 Q  All right. I'm showing you Cone 2594, which is an
10   attachment to that October email on Exhibit 1.
11 A  Um-hmm.
12 Q  Do you recognize that budget?
13 A  It looks like an iteration of the budget as generally
14   recognized.
15 Q  And that was the budget that was shared with Ambassador
16   Otaiba --
17 A  I believe so.
18 Q  And that was the budget that was approved?
19 A  I believe so.
20 Q  And do you know who prepared this budget?
21 A  I do not.
22     MR. BOURQUE: When you say "this," you're --
23     MR. JUCKNIESS: 2457.
24     MR. BOURQUE: -- referring to 2457?
25 BY MR. JUCKNIESS: