# EXHIBIT 1

```
1                    IN THE UNITED STATES DISTRICT COURT

2                 FOR THE EASTERN DISTRICT OF MICHIGAN

3

4    MARGARET CONE,

5                                      Case No. 2:16-cv-11306

6          Plaintiff,                  Hon. Sean F. Cox

7    vs.                               Mag. Judge Stephanie D. Davis

8

9    MARK TESSLER, SHERMAN JACKSON,

10   and DAVID HOWELL,

11   jointly and severally,

12

13        Defendants.

14

15

16                        VIDEOTAPED DEPOSITION

17

18   DEPONENT:   SHERMAN A. JACKSON - NON-CONFIDENTIAL PORTION

19   DATE:       Monday, October 9, 2017

20   TIME:       9:27 a.m.

21   LOCATION:   Hooper Hathaway, P.C.

22               126 S. Main Street

23               Ann Arbor, Michigan

24   REPORTER:   Elizabeth G. LaBarge, CSR-4467

25   JOB NO:     5380
```

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

Page 2

```
 1  APPEARANCES:
 2
 3       JUCKNIESS LAW FIRM PLC
 4       By:  Frederick Juckniess, Esq.
 5       302 E. Liberty Street, Suite 203
 6       Ann Arbor, Michigan  48104
 7       (734) 707-1515
 8       rick@juckniesslaw.com
 9            Appearing on behalf of the Plaintiff.
10
11       EBY, CONNER, SMILLIE & BOURQUE, PLLC
12       By:  Thomas B. Bourque, Esq.
13       320 Miller Avenue, Suite 190
14       Ann Arbor, Michigan  48103
15       (734) 769-2691
16       bourque@eecsb.com
17            Appearing on behalf of the Defendants.
18
19
20       Also Present:  Margaret Cone, Plaintiff
21                      Jane McMillan, Videographer
22
23
24
25
```

Page 3

```
 1                    I N D E X
 2
 3  WITNESS
 4
 5       SHERMAN A. JACKSON                      PAGE
 6
 7  Examination by Mr. Juckniess              10
 8
 9       CONFIDENTIAL PORTION BOUND UNDER SEPARATE COVER
10                 Pages 93 - 103
11
12
13
14
15               E X H I B I T S
16
17  NUMBER          DESCRIPTION               PAGE
18  Exhibit 1    Email Re: Letter for U of M, and
19               document entitled World Leadership
20               Program . . . . . . . . . . . . . . .   23
21  Exhibit 2    Proposal Approval Form . . . . . . . .  62
22  Exhibit 3    Effort reporting report . . . . . . .   80
23  Exhibit 4    *CONFIDENTIAL* Submittal Form . . . . . 92
24  Exhibit 5    eResearchM Proposal Management document
25               with attachments . . . . . . . . . . .  106
```

Page 4

```
 1              E X H I B I T S
 2
 3  NUMBER         DESCRIPTION              PAGE
 4  Exhibit 6    12/14/08 letter . . . . . . . . . . .  135
 5  Exhibit 7    10/29/09 summary letter . . . . . . .  137
 6  Exhibit 8    10/30/09 letter . . . . . . . . . . .  143
 7  Exhibit 9    World Leadership Program document . . . 149
 8  Exhibit 10   Dear Dr. Tayyeb letter . . . . . . . . 151
 9  Exhibit 11   1/15/09 memo Re: Timeline for Implementing
10               the World Leadership Program . . . . . 151
11  Exhibit 12   World Leadership Program
12               Five Year Budget . . . . . . . . . .   153
13  Exhibit 13   11/3/09 email chain Re: Sherman . . . . 155
14  Exhibit 14   11/3/09 email chain Re: Sherman,
15               and attachment . . . . . . . . . . . . 160
16  Exhibit 15   11/4/09 email chain Re: Following up . 162
17  Exhibit 16   11/30/09 email chain Re: Check out
18               Crisis Puts Focus on Dubai's Complex
19               Relationship With Abu Dhabi . . . . . . 164
20  Exhibit 17   11/30/09 and 11/24/09 emails
21               Re: Checking in . . . . . . . . . . .  170
22  Exhibit 18   12/1/09 letter . . . . . . . . . . .   176
23  Exhibit 19   12/8/09 letter . . . . . . . . . . .   179
24  Exhibit 20   12/14/09 letter . . . . . . . . . . .  181
25  Exhibit 21   1/15/10 letter . . . . . . . . . . .   183
```

Page 5

```
 1              E X H I B I T S
 2
 3  NUMBER         DESCRIPTION              PAGE
 4  Exhibit 22   2/16/10 email Re: Urgent: for your
 5               review: Draft/temporary WLP budget,
 6               just to get the account open and funded
 7               for you, and attachment . . . . . . . . 188
 8  Exhibit 23   2/22/10 email chain Re: Urgent:
 9               FW: Post a Comment to the Entire Project
10               Activity . . . . . . . . . . . . . . .  193
11  Exhibit 24   2/26/10 email chain Re: FW: INFO: PAN
12               for N012118-0 (10-PAF03370) Jackson . . 197
13  Exhibit 25   3/3/10 email Re: Greetings and Thanks . 200
14  Exhibit 26   1/15/10 email chain Re: Urgent: for
15               your review - draft letter to UAE to ask
16               for wiring of funds . . . . . . . . . . 201
17  Exhibit 27   Document entitled WLP Program - al-Azhar
18               and U. of Michigan Phone meeting #2 on
19               July curriculum and core faculty
20               March 9, 2010 . . . . . . . . . . . . . 203
21  Exhibit 28   3/9/10 email chain Re: Urgent: WLP
22               governance . . . . . . . . . . . . . . 204
23  Exhibit 29   3/9/10 email chain Re: Urgent: WLP
24               governance . . . . . . . . . . . . . . 209
25  Exhibit 30   3/12/10 letter entitled Draft . . . . . 218
```

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

Page 6

| 1 | | E X H I B I T S | |
|---|---|---|---|
| 2 | | | |
| 3 | NUMBER | DESCRIPTION | PAGE |
| 4 | Exhibit 31 | 3/13/10 and 3/12/10 email chain | |
| 5 | | Re: The WLP project could be going better | |
| 6 | | and 3/12/10 email chain Re: Revised | |
| 7 | | pricing for Maynard House . . . . . . . | 222 |
| 8 | Exhibit 32 | 3/16/10 email chain Re: UAE Donation . | 227 |
| 9 | Exhibit 33 | 3/23/10 email chain Re: are we have a | |
| 10 | | call today . . . . . . . . . . . . . . . | 234 |
| 11 | Exhibit 34 | Calendars entitled Jackson Planned | |
| 12 | | Absences from Ann Arbor . . . . . . . | 236 |
| 13 | Exhibit 35 | 3/29/10 and 3/27/10 email chain | |
| 14 | | Re: completed JIs . . . . . . . . . . . | 242 |
| 15 | Exhibit 36 | 3/28/10 email Re: WLP: now Sherman is | |
| 16 | | upset with me, and 3/28/10, 3/27/10, | |
| 17 | | and 3/26/10 email chain Re: WLP: | |
| 18 | | Urgent: for your review - Maynard | |
| 19 | | House Standard Lease . . . . . . . . . . | 244 |
| 20 | Exhibit 37 | 4/2/10 email Re: Al Azhar Project . . . | 254 |
| 21 | Exhibit 38 | 4/5/10 email chain Re: Al Azhar Project | 258 |
| 22 | Exhibit 39 | 4/8/10 email chain Re: cps, and 4/8/10 | |
| 23 | | and 4/9/10 email chain Re: DS 2019 . . | 261 |
| 24 | Exhibit 40 | 4/20/10 email Re: FYI: Agenda for my | |
| 25 | | meeting with Sherman this morning . . . | 268 |

Page 7

| 1 | | E X H I B I T S | |
|---|---|---|---|
| 2 | | | |
| 3 | NUMBER | DESCRIPTION | PAGE |
| 4 | Exhibit 41 | 3/30/10 email chains Re: Just FYI, | |
| 5 | | another WLP email, and Re: URGENT . . | 269 |
| 6 | Exhibit 42 | 4/12/10 email chain Re: Is this ok? | |
| 7 | | Re: WLP: Very Urgent; Re: Date; | |
| 8 | | Re: Accounting; and Re: Date . . . . . | 277 |
| 9 | Exhibit 43 | 4/12/10 email Re: WLP: Mark's recent | |
| 10 | | emails . . . . . . . . . . . . . . . . | 283 |
| 11 | Exhibit 44 | 4/14/10 and 4/13/10 email chain Re: Fwd: | |
| 12 | | My reimbursements and compensation . . | 286 |
| 13 | Exhibit 45 | 4/14/10 and 4/13/10 email chain Re: Fwd: | |
| 14 | | My reimbursements and compensation . . | 289 |
| 15 | Exhibit 46 | 4/17/10 email chain Re: UPDATE; | |
| 16 | | Confidential . . . . . . . . . . . . . | 291 |
| 17 | Exhibit 47 | 6/30/10 letter . . . . . . . . . . . . | 293 |
| 18 | Exhibit 48 | 4/28/10 letter . . . . . . . . . . . . | 297 |
| 19 | Exhibit 49 | 4/26/10 email Re: WLP Close Out . . . . | 299 |
| 20 | Exhibit 50 | ISR Personnel Transaction Form . . . . | 301 |
| 21 | Exhibit 51 | 5/29/10 and 5/28/10 email chain | |
| 22 | | Re: Sherman Jackson's compensation on | |
| 23 | | the WLP project . . . . . . . . . . . . | 303 |
| 24 | Exhibit 52 | Adjunct Payment Form . . . . . . . . . | 304 |
| 25 | | | |

Page 8

| 1 | | E X H I B I T S | |
|---|---|---|---|
| 2 | | | |
| 3 | NUMBER | DESCRIPTION | PAGE |
| 4 | Exhibit 53 | Document entitled Islamic Law, | |
| 5 | | Final Exam . . . . . . . . . . . . . . | 305 |
| 6 | Exhibit 54 | Printout entitled Join MPAC at ISNA's | |
| 7 | | 47th Annual Convention This Weekend . . | 306 |
| 8 | Exhibit 55 | Chart entitled U029255 . . . . . . . . | 308 |
| 9 | Exhibit 56 | 1090 and W-2 statements . . . . . . . . | 309 |
| 10 | Exhibit 57 | 4/22/10 letter . . . . . . . . . . . . | 310 |
| 11 | Exhibit 58 | Curriculum Vitae of Sherman A. Jackson | 311 |
| 12 | Exhibit 59 | Excerpt from The University of Michigan | |
| 13 | | Faculty Handbook . . . . . . . . . . . | 313 |
| 14 | Exhibit 60 | 6/8/10, 6/4/10, 5/29/10, and 5/28/10 | |
| 15 | | email chain Re: Sherman Jackson's | |
| 16 | | compensation on the WLP project . . . . | 315 |
| 17 | | * * * | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Page 9

1        Monday, October 9, 2017
2        Ann Arbor, Michigan
3        9:27 a.m.
4                * * *
5        VIDEOGRAPHER: We are now on the record. The time
6  is 9:27 a.m. on Monday, October 9th, 2017, for the
7  deposition of Sherman Jackson. We are taking this
8  deposition at 126 South Main Street in Ann Arbor,
9  Michigan, in the action entitled Margaret Cone versus
10 Mark Tessler, Sherman Jackson, and David Howell in the
11 United States District Court for the Eastern District of
12 Michigan. This is Case Number 2:16-cv-11306-SFC-SDD.
13        Will the court reporter please swear in the witness
14 and the attorneys briefly identify themselves for the
15 record?
16        COURT REPORTER: And I will swear you in if you'll
17 raise your right hand.
18        Do you solemnly swear or affirm the testimony you
19 are about to give will be the truth, the whole truth,
20 and nothing but the truth?
21        THE WITNESS: I do.
22        MR. JUCKNIESS: Frederick Juckniess on behalf of
23 Margaret Cone.
24        MR. BOURQUE: Tom Bourque on behalf of the
25 defendants.

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

Page 10

1    SHERMAN A. JACKSON
2    having been first duly sworn, was examined and
3    testified as follows:
4        EXAMINATION
5    BY MR. JUCKNIESS:
6  Q  Good morning. Do I address you as Dr. Jackson?
7  A  Whatever you're comfortable with.
8  Q  Okay. Dr. Jackson, can you tell me your current
9    address?
10  A  9724 Garnish Drive, Downey, California 90240.
11  Q  And your current employer?
12  A  The University of Southern California.
13  Q  And what is your position with the University of
14    Southern California?
15  A  I am the King Faisal Chair of Islamic Thought and
16    Culture.
17  Q  Okay. So are you a full-time employee?
18  A  Yes.
19  Q  And is that do you spend 100 percent of your time at
20    that -- doing that professorship?
21  A  Well, I -- that's my full-time job. I do lectureships
22    and some teaching occasionally in other venues.
23  Q  Do you have other current adjunct professorships?
24  A  No.
25  Q  Okay. And when did you join the U of M as a professor?

Page 11

1  A  In 1997, I believe.
2  Q  Okay. And what was your position at the time you joined
3    U of M?
4  A  It was, if I recall correctly, Associate Professor of
5    Near Eastern Studies.
6  Q  Okay. And later were you tenured?
7  A  Actually, I came in as a tenured transfer. I think
8    there may have been one year for them to confirm that
9    process, but I came in -- I had tenure before I came
10    here.
11  Q  Okay. And when did you leave the U of M?
12  A  I left the University of Michigan in 2011.
13  Q  Okay. And when you left the University of Michigan, did
14    you receive a copy of your emails from the university?
15  A  No.
16  Q  Did you take any of your files?
17  A  I -- email files?
18  Q  Electronic or hard copy.
19  A  I'm not sure I understand the question. I had laptops
20    that I used here that I took and one desktop, as well,
21    but my understanding from the University of Michigan was
22    that my email account will not transfer.
23  Q  Okay. And so did you make arrangements to take any of
24    your emails with you?
25  A  No, not that I recall, no. I'm not sure I understand

Page 12

1    that question, take my emails with me.
2  Q  Take an electronic copy of your emails?
3  A  No, not that I recall, no.
4  Q  Were any of your emails resident on your laptop or
5    desktop that you know of?
6  A  Not that I'm aware of, unless there were documents that
7    had been downloaded.
8  Q  Okay. And you said there were laptops. Do you still
9    have those laptops?
10  A  I have one laptop. Neither of those are -- one laptop
11    is half operable, doesn't come up all the time. And the
12    second laptop I had -- I have.
13  Q  Okay. Do you still use that laptop?
14  A  No.
15  Q  And the desktop?
16  A  No.
17  Q  That's gone?
18  A  No, no, no. I don't use it.
19  Q  Okay. You still have it?
20  A  I do.
21  Q  All right. And did you search the laptops or desktop
22    for documents relevant to this case?
23  A  Yes.
24  Q  Okay. So the last time you turned on the desktop was
25    when?

Page 13

1  A  I don't know the date, but when I got the --
2  Q  Document request?
3  A  Yes.
4  Q  Okay. And the same for the laptops?
5  A  Yes.
6  Q  All right. So the documents you produced in the case
7    are all the documents that you have that are related to
8    the World Leadership Program?
9  A  All the documents that I could retrieve, yes, based on
10    the inquiries that were sent to me.
11  Q  Were there any other documents related to the World
12    Leadership Program that you did not produce?
13  A  Not to my knowledge.
14  Q  Have you been deposed before?
15  A  No.
16  Q  Have you been involved in any civil litigation
17    previously?
18    MR. BOURQUE: You mean other than the two lawsuits
19    in this case? I mean involving this incident? I mean
20    this stuff. There were two previous lawsuits where he
21    was sued by Ms. Cone or World Leadership Program, Inc.,
22    so are we excluding those or including those?
23    MR. JUCKNIESS: Yeah, let's exclude --
24    MR. BOURQUE: Okay.
25    MR. JUCKNIESS: -- anything related to this case or

Page 22

1  A  Yes.

2  Q  Um-hmm. And who was it at the University of Michigan

3     that introduced you to Mr. Bourque?

4  A  I believe it was Tom Blessing.

5  Q  Okay. And who is paying Mr. Bourque's attorney's fees?

6  A  I assume the University of Michigan.

7  Q  Okay. And is there anyone at the University of Michigan

8     who you are in regular contact with regarding this case?

9  A  Other than my attorney?

10 Q  Other than Mr. Bourque.

11 A  No.

12 Q  Okay.

13        MR. BOURQUE: Before we get started on that --

14        MR. JUCKNIESS: Sure.

15        MR. BOURQUE: -- we had ten or nine exhibits, I

16     think, at the two depositions in Baltimore. I've

17     just -- I was planning to just use those as

18     Defendants' 1 through 9 and then continue with that. I

19     presume you'd want to have Plaintiff's in whatever

20     numbers you want. Is that --

21        MR. JUCKNIESS: Sure.

22        MR. BOURQUE: -- okay?

23        MR. JUCKNIESS: Yeah. I mean, these will say

24     "Jackson" and we'll treat them as --

25        MR. BOURQUE: As Plaintiff's. I mean, that way we

Page 23

1     can just try and not have twenty 1s. Not have twenty

2     1s.

3        (Exhibit 1 was marked for identification.)

4  BY MR. JUCKNIESS:

5  Q  All right. I've handed you what has been marked as

6     Exhibit 1. And this is an email dated October 19th,

7     2009, from Margaret Cone to otaiba7@hotmail.com and cc'd

8     to sajackson@umich.edu as well as someone else and it

9     begins "Dear Ambassador Otaiba."

10 A  Um-hmm.

11 Q  So do you recall in October 2009 receiving an email

12     regarding the World Leadership Program that was

13     addressed to Ambassador Otaiba?

14 A  I don't recall this, which is not to say that it didn't

15     occur, but I don't recall this specific email.

16 Q  Okay. Do you recall that Ms. Cone drafted a -- drafted

17     the text or correspondence for Ambassador Otaiba to

18     respond regarding the World Leadership Program?

19 A  I don't know what Ms. Cone drafted. I don't recall her

20     having drafted anything in my presence.

21 Q  Okay. Let me ask you what was the first time that you

22     spoke to Ambassador Otaiba?

23 A  I don't recall speaking to Ambassador Otaiba personally.

24 Q  Okay. During the development of the World Leadership

25     Program -- and I'll back up one step and say what was

Page 24

1     the World Leadership Program as you recall?

2  A  You mean the project that Ms. Cone and I began

3     discussing or the overall entity?

4  Q  The project.

5  A  The project.

6  Q  The entity wasn't formed until --

7  A  Well, the --

8  Q  -- well after --

9  A  -- project itself was a project that was evolving. At

10     its core, my understanding was sort of a -- not an

11     exchange program, but a program in which students would

12     come from Egypt to the United States, receive training

13     primarily in English and perhaps some exposure to

14     American culture and some other coincidental things, and

15     that was pretty much it.

16 Q  That was the concept?

17 A  Basically, yeah, the basic concept.

18 Q  And when did you start talking about that concept with

19     Ms. Cone?

20 A  I believe she contacted me in -- sometime in 2008.

21 Q  And she called you on the telephone?

22 A  Um-hmm.

23 Q  Yes?

24        MR. BOURQUE: You've got to say --

25 A  Yes, yes, yes, yes. I'm sorry.

Page 25

1        MR. BOURQUE: You've got to remember to say --

2        THE WITNESS: I'm sorry, I apologize.

3  BY MR. JUCKNIESS:

4  Q  That's all right. I'll remind you.

5        And do you recall when that was in 2008?

6  A  No.

7  Q  Do you recall how many conversations you had with her in

8     2008 --

9  A  No.

10 Q  -- about -- was it more than three?

11 A  In the whole 2008?

12 Q  Yeah.

13 A  Oh, I -- I assume so.

14 Q  Okay.

15 A  But I could not give you a number.

16 Q  Okay. And what was it that you were agreeing to do in

17     connection with the program?

18 A  I was not -- well, the program was an idea, so what I

19     agreed to do was to continue to talk about what I

20     considered to be in its essence a reasonable idea.

21 Q  Okay. And then you continued to talk into 2009 with

22     Ms. Cone?

23 A  Yes.

24 Q  And did the project -- what -- what -- how long were

25     those conversations?

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

Page 26

1  A  I'm not sure I understand the question. You mean the
2     duration of a field conversation or how long over a
3     period of time?
4  Q  Good point. Did you spend a lot of time talking about
5     this stuff or a little time? Well, let --
6  A  I mean, enough --
7  Q  I'll ask it this way, which is, you know, how far along
8     was the project in terms of its development in two
9     thousand -- at the beginning of 2009?
10 A  The beginning of 2009, that would be around January
11    2009, I think that -- that some of the conceptual
12    aspects were beginning to gain some clarity, to be more
13    clear.
14 Q  Okay. And what were the conceptual aspects that were --
15 A  Again --
16 Q  -- beginning at that point?
17 A  -- the exchange of the students, the Cairo connection.
18    Coming to the United States. That these would be Azhari
19    students. Those kinds of things were beginning to
20    crystallize.
21 Q  Can you spell Azhari?
22 A  A-z-h-a-r-i.
23 Q  And that's an Islamic university in Egypt or --
24 A  Yes.
25 Q  And did you have -- was it you or Margaret Cone who had

Page 27

1     the connections with the university in Cairo, the Azhari
2     university?
3  A  I presume Ms. Cone.
4  Q  At the time, you did not have any connections at that
5     university that --
6  A  Well, I did not have any connections, per se, within the
7     administration.
8  Q  And so by the time the beginning of 2009 had come around
9     and there were some more conceptual aspects developed
10    for the World Leadership Program, as you say, at that
11    time, what had you agreed to do with respect to the
12    program?
13 A  Well, again, the -- as I said, I didn't say "developed,"
14    I said began to crystallize. And the issue, as I recall
15    at that point, was whether or not the University of
16    Michigan might be -- and this goes back some time -- a
17    place where this program could take place.
18 Q  Were you considering that it might take place some place
19    else under your direction?
20 A  No. My understanding was that the exploration was
21    around whether or not this project could be hosted at
22    the University of Michigan. I had no other ideas
23    about -- I had no other entities with which I could
24    connect this project.
25 Q  Okay. And at that time, were you expected to perform

Page 28

1     any function with respect to that program or what was
2     your anticipated role?
3  A  Well, again, to explore the possibilities of the program
4     being housed at the University of Michigan, in which
5     capacity I would be the point person or liaison.
6  Q  The point person or liaison?
7  A  Um-hmm.
8  Q  And by liaison, you mean liaison between the program and
9     the university?
10 A  Between the program and the university.
11 Q  And what -- what were you expecting those duties to be
12    as point person and liaison?
13 A  Well, again, as I said, the program was still in a state
14    of flux, it was in some ways constantly being -- not
15    redefined, but I guess from certain perspectives,
16    fine-tuned, you know, this idea tried and then abandoned
17    and other ideas come in that could be, et cetera, but as
18    a faculty person at the University of Michigan, I was
19    the person who would be expected to -- would be expected
20    to -- to establish the relationship, establish
21    connections with University of Michigan personnel to see
22    if, again, this was a feasible place for the project.
23 Q  What about to obtain approvals, was that -- would that
24    have been your job, as well?
25 A  I didn't think of it in those terms.

Page 29

1  Q  So --
2  A  But --
3  Q  -- eventually, the flux ended and the program was going
4     to be housed at the University of Michigan, correct?
5  A  Almost correct. I would say that the -- the decision
6     for the program to be housed at the University of
7     Michigan was reached at a time when I think still
8     aspects of the program were still being discussed.
9  Q  Okay. And when was that understanding reached?
10 A  I don't -- I can't give you a date, I --
11 Q  2009?
12 A  I assume.
13 Q  How -- how was that decision written down or documented?
14 A  Which decision?
15 Q  The decision that was reached that it would be housed at
16    the University of Michigan, the one that you're
17    referring to?
18 A  My understanding is that Mark Tessler received a letter
19    from Ambassador Otaiba and then he and I wrote back a
20    letter to Ambassador Otaiba confirming that
21    relationship.
22 Q  Okay. And are you -- are you saying that you -- you
23    don't think that you personally agreed to perform any
24    duties with respect to the WLP?
25 A  I think that there were certain general expectations,

Page 26

1  A  I'm not sure I understand the question. You mean the
2     duration of a field conversation or how long over a
3     period of time?
4  Q  Good point. Did you spend a lot of time talking about
5     this stuff or a little time? Well, let --
6  A  I mean, enough --
7  Q  I'll ask it this way, which is, you know, how far along
8     was the project in terms of its development in two
9     thousand -- at the beginning of 2009?
10 A  The beginning of 2009, that would be around January
11    2009, I think that -- that some of the conceptual
12    aspects were beginning to gain some clarity, to be more
13    clear.
14 Q  Okay. And what were the conceptual aspects that were --
15 A  Again --
16 Q  -- beginning at that point?
17 A  -- the exchange of the students, the Cairo connection.
18    Coming to the United States. That these would be Azhari
19    students. Those kinds of things were beginning to
20    crystallize.
21 Q  Can you spell Azhari?
22 A  A-z-h-a-r-i.
23 Q  And that's an Islamic university in Egypt or --
24 A  Yes.
25 Q  And did you have -- was it you or Margaret Cone who had

Page 27

1     the connections with the university in Cairo, the Azhari
2     university?
3  A  I presume Ms. Cone.
4  Q  At the time, you did not have any connections at that
5     university that --
6  A  Well, I did not have any connections, per se, within the
7     administration.
8  Q  And so by the time the beginning of 2009 had come around
9     and there were some more conceptual aspects developed
10    for the World Leadership Program, as you say, at that
11    time, what had you agreed to do with respect to the
12    program?
13 A  Well, again, the -- as I said, I didn't say "developed,"
14    I said began to crystallize. And the issue, as I recall
15    at that point, was whether or not the University of
16    Michigan might be -- and this goes back some time -- a
17    place where this program could take place.
18 Q  Were you considering that it might take place some place
19    else under your direction?
20 A  No. My understanding was that the exploration was
21    around whether or not this project could be hosted at
22    the University of Michigan. I had no other ideas
23    about -- I had no other entities with which I could
24    connect this project.
25 Q  Okay. And at that time, were you expected to perform

Page 28

1     any function with respect to that program or what was
2     your anticipated role?
3  A  Well, again, to explore the possibilities of the program
4     being housed at the University of Michigan, in which
5     capacity I would be the point person or liaison.
6  Q  The point person or liaison?
7  A  Um-hmm.
8  Q  And by liaison, you mean liaison between the program and
9     the university?
10 A  Between the program and the university.
11 Q  And what -- what were you expecting those duties to be
12    as point person and liaison?
13 A  Well, again, as I said, the program was still in a state
14    of flux, it was in some ways constantly being -- not
15    redefined, but I guess from certain perspectives,
16    fine-tuned, you know, this idea tried and then abandoned
17    and other ideas come in that could be, et cetera, but as
18    a faculty person at the University of Michigan, I was
19    the person who would be expected to -- would be expected
20    to -- to establish the relationship, establish
21    connections with University of Michigan personnel to see
22    if, again, this was a feasible place for the project.
23 Q  What about to obtain approvals, was that -- would that
24    have been your job, as well?
25 A  I didn't think of it in those terms.

Page 29

1  Q  So --
2  A  But --
3  Q  -- eventually, the flux ended and the program was going
4     to be housed at the University of Michigan, correct?
5  A  Almost correct. I would say that the -- the decision
6     for the program to be housed at the University of
7     Michigan was reached at a time when I think still
8     aspects of the program were still being discussed.
9  Q  Okay. And when was that understanding reached?
10 A  I don't -- I can't give you a date, I --
11 Q  2009?
12 A  I assume.
13 Q  How -- how was that decision written down or documented?
14 A  Which decision?
15 Q  The decision that was reached that it would be housed at
16    the University of Michigan, the one that you're
17    referring to?
18 A  My understanding is that Mark Tessler received a letter
19    from Ambassador Otaiba and then he and I wrote back a
20    letter to Ambassador Otaiba confirming that
21    relationship.
22 Q  Okay. And are you -- are you saying that you -- you
23    don't think that you personally agreed to perform any
24    duties with respect to the WLP?
25 A  I think that there were certain general expectations,

**Page 30**

1 but beyond the position of PI, there was always a
2 certain ambiguity in that regard.
3 Q During 2008, 2009, did you ever tell Margaret Cone
4 you would -- what duties you would perform with respect
5 to the WLP?
6 A I have no recollection of telling her any kind of duties
7 I would perform.
8 Q Do you recall telling her that you would be there to be
9 the point person?
10 A I don't recall telling her I would be anywhere to be a
11 point person, but --
12 Q Do you think that you need to be at the place to be the
13 point person?
14 A Not necessarily.
15 Q Not for this program, you didn't think that you actually
16 had to attend in order to be the point person?
17 A No.
18 Q And that if you had -- if you actually hadn't attended,
19 that would be fine?
20 A As I said.
21 Q As you said what?
22 A As I said, the aspects of the program that I -- aspects
23 of the program that I assumed that I was being looked to
24 to facilitate were not aspects that absolutely required
25 my presence on the ground at the time of the program.

**Page 31**

1 Q Did you tell Ms. Cone that you didn't think you had to
2 be there?
3 A We never, to my recollection, discussed that.
4 Q Do you think that she ever got the impression that you
5 would actually attend and be a present point person?
6 A I can't say what impression Ms. Cone got.
7 Q So did you have a meeting with Ms. Cone in 2009 to
8 discuss your involvement with the WLP?
9 A We met a number of times in 2008, 2009, I would assume.
10 Q You met a number of times in 2009?
11 A I said 2008, 2009.
12 Q Okay. I'm just talking 2009 now, did you meet --
13 A 2009.
14 Q -- with -- yeah.
15 A I have a faint recollection. We must have met or
16 certainly communicated before we met with
17 Sheikh Al-Tayyeb in Egypt and I don't know the actual
18 sequencing of those meetings.
19 Q So you don't remember one way or another if you met with
20 her in person during the summer of 2009?
21 A I'm -- I'm -- I'm assuming that we did, but I can't
22 recall a specific meeting, per se.
23 Q You don't recall one way or the other?
24 A No.
25 Q And so I take it that you also don't recall what you

**Page 32**

1 discussed during the summer of 2009 regarding your role
2 with the WLP?
3 A When you say "discussed" --
4 Q With Ms. Cone.
5 A In a particular meeting, no.
6 Q And so your best recollection of what you told her is
7 that you don't recall? What is your best recollection
8 of what you told her about what your role would be with
9 the WLP in the summer of 2009?
10 A Well, my best recollection is a continuation of what I
11 always represented, and that was that I would facilitate
12 finding a place and trying to make sure that that place
13 was feasible and appropriate and allowing the program to
14 run.
15 Q So you were just supposed to find a place and you
16 weren't going to --
17 A No, not just a --
18 Q -- have to --
19 A Not just a place, but we spoke about teachers --
20 Q Were you going to be a teacher?
21 A That was never -- that was never a commitment I have. I
22 don't know if Ms. Cone expected that, but that was --
23 Q Did you commit to having any actual involvement with the
24 WLP then, like when the students were actually at the
25 University of Michigan, were you going to have an actual

**Page 33**

1 role?
2 A Well, I never made any specific commitment to any
3 particular role. Again, these issues were discussed in
4 summary fashion and then as things developed, Ms. Cone
5 took on roles that rendered any number of aspects of our
6 conversations rather moot.
7 Q Okay. And so you later were paid approximately $73,000
8 out of the WLP funds?
9 A If that's what the record shows. I don't recall the
10 exact amount.
11 Q Okay. But up through 2009, the most you had done about
12 your role is to talk in summary fashion about what that
13 role was going to be with Ms. Cone?
14 A In summary fashion we discussed curriculum, broad idea
15 implications of the program, where it could go, how it
16 could go, and then I did go about the business of
17 facilitating or trying to facilitate or exploring the
18 facilitation of this program being housed with the
19 University of Michigan.
20 Q Yeah, but as far as the program and your role, your
21 words, you had just discussed in summary fashion what
22 you might do, and it did not include you teaching and it
23 did not include you actually being there at the program,
24 correct?
25 A It did not explicitly include that.

Page 34

1  Q  Either of those things, correct?
2  A  It did not explicitly include my teaching nor explicitly
3     include my being present at the time of the program.
4  Q  Anything else that it did explicitly include regarding
5     your actual involvement other than facilitating its
6     housing at the U of M?
7  A  Well, that was not a -- that was not a mean feat of the
8     whole --
9  Q  I'm not asking if it's a mean feat.
10 A  Okay.
11 Q  I'm asking you other than facilitating, what other roles
12    and duties did you discuss?  Because all this stuff was
13    only discussed in summary fashion in 2009, correct?
14 A  Again, we discussed issues having to do with curriculum,
15    teachers, personnel.  I did reach out to certain people
16    as prospective teachers, if I recall, I wrote a number
17    of letters.  Now, I don't know if that was 2009 or
18    later or earlier, but those are some of the things that
19    were -- that were done.
20 Q  Okay.  Did you later then have a meeting with Sheikh
21    Al-Tayyeb?
22 A  Yes, in Cairo.
23 Q  And do you recall approximately when that meeting took
24    place?
25 A  Summer 2009.

Page 35

1  Q  July, August, September, October?
2  A  I'm guessing June.
3  Q  Had you prepared a budget for the program by that time?
4  A  I don't recall.
5  Q  Okay.  And you recall that Ms. Cone had prepared a
6     budget, correct?
7  A  I believe so.
8  Q  You didn't separately yourself prepare a budget?
9  A  No.
10 Q  And do you recall what happened at the meeting with
11    Sheikh Al-Tayyeb?
12 A  Yes.
13 Q  And can you tell me your best recollection of what you
14    said and what was said to you?
15 A  Well, Sheikh Al-Tayyeb's primary and repeated concern
16    was that this program not take place in a location or a
17    fashion that would be a threat to the religiosity of the
18    Azhari students.
19 Q  So it was a sensitive project in the way that it was
20    going to be executed, needed to be --
21 A  I don't -- I'm not sure I would describe it in those
22    terms, but he was concerned that these Muslim students
23    coming to the West might be proselytized or visited upon
24    with certain influences that might seek to come between
25    them and their religion, so he wanted to know that this

Page 36

1     was not an Orientalist westernizing sort of secularizing
2     attempt on the part of these students, and that was
3     his -- his greatest concern in my -- in my
4     understanding.
5  Q  And did you address that concern for him?
6  A  Yes.
7  Q  And what did you tell him?
8  A  I told him that the University of Michigan, where I was
9     working, would not be a place hostile to these students.
10 Q  And did you tell him that you would play any role in
11    connection with ensuring that that would be the case --
12 A  Yes.
13 Q  -- if the program were to go forward?
14 A  Yes, and that my involvement in the program would
15    function in a fashion that sought to ensure that that
16    would not happen.
17 Q  And did you tell him that you would be present for the
18    program?
19 A  In a general sense in terms of facilitation of the
20    program, that was assumed.
21 Q  Did you tell him you would be present for the program
22    when the program actually took place in Ann Arbor?
23 A  No, that wasn't discussed as far as I recall.
24 Q  Did you tell him that you would not be present?
25 A  No.

Page 37

1  Q  Did you tell anybody what your schedule, what your
2     planned schedule was for that period of time in 2010
3     when the program was being scheduled?
4  A  No.
5  Q  And why not?
6  A  I don't understand your question.
7  Q  Do you ever tell people when you're scheduling stuff
8     that involves them that you have conflicting
9     obligations?
10 A  Yes.
11 Q  Okay.  And did you have any conflicting obligations in
12    the summer of 2010?
13 A  In the summer of 2010?
14 Q  Um-hmm.  Or during the time when the WLP was being
15    planned.
16 A  Well, if you mean during 2009, my summer commitments
17    are -- were two.  The first, which is Seton Hall, the
18    law school program, that was on -- that was basically
19    determined on a year-by-year basis, so a month or
20    two -- I don't recall exactly, but a month or two before
21    the program was going to take place, the director would
22    contact me and say are you -- you know, do you want to
23    participate in the program this year, and I would
24    basically say yes and then we'd proceed from there.
25       The other commitment that I had, and again, these

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

Page 38

1  were presumed commitments, I mean, if something came up
2  for the purpose of -- or in a fashion that meant that I
3  couldn't be there for this other commitment, then we'd
4  negotiate that, as well, and that was the American
5  Learning Institute for Muslims which was here in
6  Ann Arbor.
7  Q  Okay.
8  A  But I -- I could not -- I mean, I could assume, okay,
9  I'll probably be involved with Seton Hall next summer,
10  but that was not up to me, that was up to the director
11  of the program to make that determination, and for any
12  number of reasons he may decide that that's not the case
13  or maybe even that the program is not going to run.
14  Q  Okay. And you -- you taught in Cairo at the Seton Hall
15  run program --
16  A  Um-hmm.
17  Q  -- during the summer of 2009, correct?
18  A  I think so, I think so, that's correct.
19  Q  And was that approximately seven weeks or eight weeks?
20  A  No.
21  Q  Okay. How many weeks? Was the program typically a
22  certain length or did it vary?
23  A  No, it was -- it was usually a certain length, but seven
24  weeks sounds very long, but I --
25  Q  Approximately.

Page 39

1  A  Approximately, well, yeah, five, seven -- five -- five,
2  six weeks, maybe seven. Okay.
3  Q  And how many years did you --
4  A  Oh --
5  MR. BOURQUE: Let him finish.
6  THE WITNESS: I'm sorry.
7  BY MR. JUCKNIESS:
8  Q  How many years did you do the Seton Hall program in
9  Cairo?
10  A  Probably about five, six maybe.
11  Q  2006, '7, '8, '9?
12  A  I know there was an interruption one or two years, but I
13  could look at my CV and --
14  Q  Okay. And the ALIM --
15  A  Um-hmm.
16  Q  -- commitment in the summer of 2010, what was that?
17  A  That's a program here in Michigan, it's a program for
18  Muslim college students, and I can be there anywhere
19  from five days to eight days, ten days, but it's
20  not -- it's not a day-long commitment, so it's a three,
21  four-hour commitment. Usually, usually.
22  Q  And what's your role at that event?
23  A  Teacher.
24  Q  You give a lecture?
25  A  I, yeah, teach some classes.

Page 40

1  Q  Okay.
2  A  And --.
3  Q  Other than the World Leadership Program, what other
4  projects did you facilitate at the U of M, if any?
5  A  None that I recall.
6  Q  Okay. So this was the only one where you -- your role
7  was facilitating trying to find --
8  A  Oh, in that --
9  Q  -- a place --
10  A  -- in that capacity, that's the only one I recall, yes.
11  Q  Okay. And just to confirm, your role was to facilitate
12  trying to find a place; not to be a teacher, not to be
13  present --
14  A  Okay.
15  Q  -- and not to lecture at the WLP --
16  A  Okay.
17  Q  -- correct?
18  A  Okay.
19  Q  Is that correct or not correct?
20  A  Yes, if I could explain.
21  Q  We'll come back to that. So let me turn you then back
22  to Exhibit 1, which was the email to Otaiba, Ambassador
23  Otaiba. And Ambassador Otaiba, you understood, was
24  someone that Margaret Cone was in contact with about
25  potentially funding the WLP?

Page 41

1  A  Yes.
2  Q  All right. And you did not have any conversations with
3  Ambassador Otaiba in 2009 --
4  A  No.
5  Q  -- is that right?
6  And then if you turn the page, the communication to
7  the ambassador, do you recall that you were part of a
8  communication to the ambassador and that included a
9  description of the World Leadership Program and a
10  budget?
11  A  I don't understand your question.
12  Q  Do you remember receiving this email and these
13  attachments in October 2009 --
14  A  This email?
15  Q  Yes.
16  A  And this attachment?
17  Q  Yes.
18  A  I recall this attachment from when I was collecting
19  documents to be submitted to this case. Going back nine
20  years, there was so much stuff coming back and forth, I
21  can't say definitively, but I --
22  Q  Okay.
23  A  Okay.
24  Q  So you did not participate in the request for funds to
25  fund the program, that was all Margaret?

Page 42

1  A  If I say yes or no, which am I answering? You asked two
2     questions.
3        MR. BOURQUE: Okay, I'll object. Compound.
4        MR. JUCKNIESS: Compound, there we go.
5  BY MR. JUCKNIESS:
6  Q  So did you participate in the request for funds to
7     Ambassador Otaiba?
8  A  No.
9  Q  And you had no role in obtaining those funds then, is
10     that correct?
11  A  No.
12  Q  Did you have any role in drafting the -- the proposal
13     that went to Otaiba?
14  A  This?
15  Q  Yes.
16  A  No. I --
17  Q  Did you have any role in preparing the draft that went
18     to Otaiba?
19  A  The --
20  Q  The draft of the budget -- sorry -- that went to
21     Ambassador Otaiba?
22  A  No.
23  Q  But you have seen these documents before?
24  A  Yes.
25  Q  And do you recall approving them before they went to

Page 43

1     Ambassador Otaiba?
2  A  No.
3  Q  Do you recall approving them or working on them at any
4     time in the summer of 2009?
5  A  Not directly.
6  Q  At the bottom of this document, the second page where it
7     says Cone 2589 --
8  A  Um-hmm.
9  Q  -- you'll that see that in the line at the bottom, it
10     says "University of Michigan International Institute,"
11     do you see that?
12  A  Um-hmm.
13  Q  And were you discussing housing the WLP at the
14     International Institute with Ms. Cone?
15  A  I was discussing the prospect of exploring that
16     possibility, yes. Or discussing --
17  Q  Discussing the prospect of exploring the possibility?
18  A  No, no. Discussing the exploration of that possibility,
19     yes.
20  Q  And then you explored that possibility?
21  A  Yes.
22  Q  So at the -- in the bottom paragraph of this document,
23     it says, "Professor Sherman Jackson at the University of
24     Michigan and Dr. Ahmed," A-h-m-e-d, "Al-Tayyeb,"
25     A-l-T-a-y-y-e-b, "the President of Al-Azhar,"

Page 44

1  A-l-A-z-h-a-r, "University, Cairo, Egypt and the former
2  Mufti," M-u-f-t-i, "of Egypt, will oversee the program."
3     You were -- is that consistent with your
4  understanding of what your role was going to be at the
5  University of Michigan with respect to the World
6  Leadership Program, to oversee the program?
7  A  Oversee? The only problem I have with that question is
8     that "oversee" can be broadly construed.
9  Q  Okay. So did you -- did you -- did you ever work on a
10     draft of this proposal with Ms. Cone prior to her
11     sending it to the ambassador or do you think she just
12     sent this off without your approval?
13  A  I did not approve it.
14  Q  You didn't approve it, you never approved this proposal?
15  A  Not to my recollection, no.
16  Q  So you didn't -- and you didn't work on making changes
17     to this proposal so that it would more accurately
18     reflect what your recollection is?
19  A  Not to my recollection.
20  Q  Okay. I'll have you turn the page, Cone 2590.
21  A  Um-hmm.
22  Q  Toward the bottom.
23  A  Um-hmm.
24  Q  Well, actually, let me take you to the first full
25     paragraph. It says, "Professor Sherman Jackson," and it

Page 45

1     has a description of you as one of the world's most
2     influential and respected Islamic scholars --
3  A  Um-hmm.
4  Q  -- and then describes things with respect to the
5     University of Michigan.
6        Is it consistent with your recollection of your
7     role that you were part of the marketing for the
8     project?
9  A  Is it consistent with my recollection of my role?
10  Q  Um-hmm.
11  A  I guess that's fair to say.
12  Q  And the expectation was that both scholars and attendees
13     would potentially be attracted to the program because of
14     your involvement?
15  A  I guess that's fair, yes.
16  Q  And you understood that at the time, correct?
17  A  Yes.
18  Q  Moving down to Cone 2590, "Program Description at a
19     Glance," this describes four parts, and just let me ask
20     you --
21  A  Wait a minute. I'm sorry, I --
22  Q  Sure.
23  A  -- I lost you.
24  Q  Same page.
25  A  Okay.

2:16-cv-11306-SFC-SDD   Doc # 87-3   Filed 05/14/18   Pg 10 of 34   Pg ID 3087

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

Page 50

1    THE WITNESS: I'm sorry. I apologize.
2  BY MR. JUCKNIESS:
3  Q  And I should have said at the beginning, if you want to
4     take a break at any time, just let us know.
5        When did you first meet with Mark Tessler about the
6     World Leadership Program?
7  A  I don't know the dates.
8  Q  Do you remember the year?
9  A  I believe it was 2008, I believe.
10  Q  And why did you meet with -- how did you know Mark
11     Tessler at the time?
12  A  Well, he is a professor here and he's also a
13     vice-provost and the --
14  Q  Provost for?
15  A  He's vice-provost in the university and a director of
16     the International Institute, and he and I had actually
17     sat on panels together about the Middle East. I had
18     seen him lecture around the university on the Middle
19     East and we got to know each other in that capacity.
20  Q  And did you approach him then with respect to the World
21     Leadership Program?
22  A  Yes.
23  Q  And why did you approach him?
24  A  Because I felt that -- two things: One, with regard to
25     any regulations with regard to the acceptance of

Page 51

1     programs like this, that as a vice-provost, he would be
2     the person who could best assure that everything would
3     be okay; and then, two, that he had familiarity with the
4     Middle East and he was very sympathetic to Middle
5     Eastern students and so in terms of the crafting of the
6     program as things went forth, he would be amenable to
7     respond in ways that would be most facilitating for the
8     program.
9  Q  Okay. And --
10  A  And he was head of the International Institute, so that
11     was a possible -- a possible home.
12  Q  Okay. And in fact, you discussed the International
13     Institute as the possible home at the University of
14     Michigan with Ms. Cone, as well, correct?
15  A  I believe so, yes.
16  Q  And the International Institute would have in your mind
17     made a proper home for the project for what reason?
18  A  According to my understanding at the time, because
19     it -- my understanding at the time was that it had
20     infrastructure.
21  Q  Okay. And at that time, 2008, 2009, had you done any
22     projects with CPS?
23  A  No.
24  Q  And what is CPS?
25  A  As far as I understand, the Center for Political

Page 52

1     Studies.
2  Q  Okay. And -- is CPS part of another entity?
3  A  I can't say for sure.
4  Q  Okay. Do you know, is it part of the U of M?
5  A  That was my understanding at the time, but I can't say
6     that for sure now either.
7  Q  Did you know one way or another at the time whether or
8     not CPS was controlled by the University of Michigan?
9  A  I assumed it was.
10  Q  Okay. And did you later learn that that was not
11     entirely accurate?
12  A  Not until this came out.
13  Q  Okay. And what did you learn?
14  A  Well, just what was in the Complaint.
15  Q  So as a professor at the University of Michigan, what
16     was your understanding of what was required to get
17     approval for a project to be housed at the University of
18     Michigan?
19  A  Well, I didn't have a clear understanding, and this is
20     one of the reasons why I turned to Mark Tessler, because
21     I felt that being in the position that he is in as a
22     vice-provost, he would have that understanding and that
23     understanding would be acted upon.
24  Q  And did you recommend that he be the principal
25     investigator instead of you?

Page 53

1  A  I -- I faintly recall a conversation, but I can't commit
2     to an answer on that one way or another.
3  Q  In fact, you took on the role as principal investigator,
4     correct?
5  A  Yes, I believe, yes.
6  Q  And what is principal investigator?
7  A  Basically, overseer of the project and the one who
8     ensures that it's consistent with its description and
9     budgetary dictates.
10  Q  Um-hmm. And what approvals are required for you to
11     become principal investigator on a sponsored project?
12  A  I'm not sure.
13  Q  Did you have any idea of what those obligations were at
14     the time?
15  A  I'm not sure.
16  Q  You don't recall one way or the other?
17  A  I have -- I had a general idea, but I don't recall
18     consulting any regulations on principal investigators.
19  Q  You did produce a professor's handbook of regulations in
20     this case. Did you review that in connection with your
21     role as principal investigator?
22  A  No.
23  Q  And so did you know what approvals were required in
24     order to make an agreement on behalf of the university?
25  A  No.

Page 54

1 Q  Did you make an agreement on behalf of the university?
2 A  Well, I went to Mark Tessler, and the agreement that was
3     made was that the International Institute would be
4     hosting the program.
5 Q  And when did you make that agreement with Mark Tessler?
6 A  Well, the agreement was, in my recollection, I mean,
7     until after we received the -- it wasn't -- it wasn't
8     formalized until after we received the letter from
9     Ambassador Otaiba. If I'm recalling correctly.
10 Q  What communication or conversation did you have with
11     Mark Tessler where you -- where he told you the
12     International Institute would be hosting?
13 A  No. I had conversations with Mark Tessler, and again,
14     please pardon me, in 2008, 2009, I'm not totally clear,
15     but I think it might have been 2008, but I broached this
16     idea to him in terms of the project as it was
17     developing. He expressed some interest, but had
18     reservations. I communicated that to Ms. Cone and then
19     the back and forth between myself, Mark Tessler, and
20     Ms. Cone began, and he had a number of reservations
21     about this project -- or how this project, what
22     kinds of requirements and commitments it would impose
23     upon the university, and he wanted to make sure that we
24     were clear about what the International Institute would
25     do and what it wouldn't do, what the University of

Page 56

1 A  My understanding was WLP.
2 Q  That WLP had an agreement with the International
3     Institute?
4 A  That was my understanding.
5 Q  And the head of the WLP was Margaret Cone?
6 A  Well, that was one of the questions that the
7     International Institute was trying to find out.
8 Q  And at some point, did Mark Tessler tell you that the
9     project should be moved to the -- to CPS?
10 A  Yes, he -- I don't remember all the details, but he
11     indicated that for some budgetary reasons, the
12     Board -- I think it was the Board of the International
13     Institute had concluded that it could not -- it could
14     not house the project, it could not take the money, and
15     he suggested that we approach CPS as a possible
16     alternative.
17 Q  Did you -- do you recall telling Ms. Cone that the
18     International Institute had said it could not house the
19     project?
20 A  I have a faint recollection of some email exchanges,
21     because Mark had sent me some emails and I copied
22     Margaret on the emails in which this was -- this was
23     discussed, but I don't recall any face-to-face
24     conversation with Ms. Cone in which I indicated that.
25     Until later.

Page 55

1     Michigan would be responsible for or would not be
2     responsible for, et cetera, et cetera, and I
3     communicated this to Ms. Cone, we went back and forth.
4     And then I think that there was a certain amount of
5     agreement pretty much reached and then there were a
6     number of outstanding questions, particularly, who or
7     what entity the International Institute would be dealing
8     with.
9 Q  Okay. And the agreement that was pretty much reached
10     was that the International Institute would host the WLP?
11 A  Pending the resolution of the outstanding issues, yes,
12     that was my understanding.
13 Q  And by resolution of the outstanding issues, that was
14     actual approval by the University of Michigan
15     International Institute of the program?
16 A  No, actually, my understanding was that --
17 Q  I'm sorry, your microphone just fell off.
18 A  Oh. Sorry. Is that okay?
19 Q  Thank you.
20 A  My understanding was, again, the main issue that I
21     recall was the question of who the -- who the
22     International Institute and the University of Michigan
23     would be partnering with.
24 Q  Okay. And did the International Institute ultimately
25     partner with anyone?

Page 57

1 Q  Okay. So you waited some time after Mark Tessler told
2     you that the International Institute could not house the
3     project before you told Ms. Cone?
4 A  No, I don't know about waited, I said I don't -- I
5     didn't have a face-to-face conversation with her until
6     later.
7 Q  Did you ever tell her directly the International
8     Institute could not house the project and it would have
9     to be housed somewhere else?
10 A  Well, again, the email exchanges indicated that. I
11     don't know the dates on the email exchanges, so I can't
12     say how long it was between one and the other.
13 Q  Did you see that as important?
14 A  What?
15 Q  That the International Institute had informed you and
16     Mr. Tessler that the -- that it could not house the
17     project?
18 A  My understanding at the time was that CPS would simply
19     be sort of a sister institution within the university,
20     and quite frankly, no, I did not see it as a major issue
21     at the time, but certainly one that warranted
22     discussion.
23 Q  Okay. Important or not important?
24 A  Important. As I said, it warranted -- it certainly
25     wanted discussion.

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

Page 58

1  Q  And so do you remember when it was that Mark Tessler
2     first told you that CPS should be considered to be -- as
3     a possible home for the project?
4  A  I don't remember, I mean, date-wise, no, I don't. I'm
5     sorry.
6  Q  Do you remember if it was before or after the approval
7     was given by Otaiba for the budget?
8  A  My guess would be that it was after.
9  Q  Did you ever communicate with Ambassador Otaiba that the
10    International Institute could not house the project?
11 A  No.
12 Q  Did you ever communicate to Ambassador Otaiba that CPS
13    would be the home for the project?
14 A  No, not to my recollection.
15 Q  Why was CPS -- did Mark Tessler convince you that CPS
16    would be a good home for the project?
17 A  I'm not sure it's fair to say whether he convinced me.
18    I, again, placed a lot of confidence in Mark as the
19    vice-provost, as the director of a center, and as
20    someone who had decent standing within the university.
21    He suggested it and I basically accepted that
22    suggestion.
23 Q  You did not have an affiliation with CPS at that time,
24    correct?
25 A  Yes. Well, no, I didn't. I'm not sure how to answer

Page 59

1     those questions. That's correct.
2  Q  And you did not have any experience with CPS at that
3     time, is that correct?
4  A  Yes, that's correct, I did not have any experience with
5     CPS at the time.
6  Q  Were you aware of any programs that had
7     been -- personally aware of any programs that had been
8     housed at CPS at that time?
9  A  No.
10 Q  Were you aware of the administrative capabilities of CPS
11    personally?
12 A  Not other than what Mark Tessler basically represented
13    to me.
14 Q  Did you try to convince Margaret Cone that CPS would be
15    a good home for the project?
16 A  I don't recall trying to convince her. I informed her
17    and suggested that she meet with them.
18 Q  So it's the case that you did not obtain university
19    approval for the program prior to Ambassador Otaiba
20    approving the budget, correct?
21 A  I'm sorry, it's a compound -- when I say "correct," what
22    am I --
23 Q  Is that statement correct?
24        MR. BOURQUE: Objection, compound.
25 BY MR. JUCKNIESS:

Page 60

1  Q  Did you receive any university approval prior to
2     Ambassador Otaiba's approval of the budget?
3  A  No.
4  Q  Did you receive any university approval prior to
5     committing the university to the -- to host the WLP?
6  A  Well, from my perspective, Mark Tessler's agreement
7     represented university approval.
8  Q  But you were the PI?
9  A  Yes.
10 Q  So you were required to get the approvals, correct?
11 A  I don't know.
12 Q  You didn't ask anyone what your obligations were as PI
13    at the time?
14 A  No.
15 Q  Did you ever look at the university principal
16    investigator policy?
17 A  No.
18 Q  Did you know that you were required to submit proposals
19    through your primary appointing unit?
20 A  No.
21 Q  Did you submit any proposal to the LS&A school?
22 A  No.
23 Q  And that was where your principal appointment was at the
24    University of Michigan, correct?
25 A  Yes.

Page 61

1  Q  You were also an adjunct law professor?
2  A  Yes.
3  Q  Did you seek approval from anyone at the law school
4     prior --
5  A  No.
6  Q  -- to -- sorry, I'll just finish --
7  A  I'm sorry.
8  Q  -- the question.
9  A  I'm sorry.
10 Q  No, that's -- I mean --
11 A  I apologize.
12 Q  I appreciate trying to move along.
13    Did you seek approval from anyone at the law school
14    regarding the World Leadership Program?
15 A  No.
16 Q  Did you ever inform anyone at the law school about your
17    involvement with the World Leadership Program?
18 A  Not to my recollection, although I think that there was
19    a teacher whom I tried to hire from the law school for
20    the program, but that's the extent of it.
21 Q  You never -- you didn't seek any kind of approval from
22    the law school regarding the World Leadership Program?
23 A  No.
24 Q  Were you yourself involved in seeking the approval of
25    the International Institute for the program?

Page 62
1  A  I don't understand the question.
2  Q  Were you yourself personally involved with asking anyone
3      at the International Institute to approve the World
4      Leadership Program?
5  A  Well, my understanding was that --
6  Q  Other than Mark Tessler?
7  A  No, no, not to my recollection.
8  Q  Thank you. Did you -- other than Mark Tessler, was
9      there anyone at the university from whom you sought
10     approval for the program?
11  A  No, not to my recollection.
12  Q  And as of 2008, 2009, you had never even read the
13     requirements for a principal investigator of a sponsored
14     project at the University of Michigan?
15  A  No.
16  Q  Were you ever informed that you had violated university
17     policy with respect to the World Leadership Program?
18  A  No.
19         (Exhibit 2 was marked for identification.)
20  BY MR. JUCKNIESS:
21  Q  Can you push this one out of your way maybe?
22         MR. BOURQUE:  Is there a second copy?
23         MR. JUCKNIESS:  Yes, there is.
24         MR. BOURQUE:  Okay.  Thank you.
25  BY MR. JUCKNIESS:

Page 64
1      World Leadership Program for approval?
2  A  I do not recall.
3  Q  Do you have any reason to disagree that there -- that
4      you did in fact sign such a form?
5  A  If my signature is on there, no.
6  Q  Okay.  Well, your signature isn't on this electronic
7      document, we didn't receive a separate document, but do
8      you have any reason to disagree that this document
9      produced by the university was in fact accurate and you
10     had signed it?
11  A  I cannot say one way or the other, unless my signature
12     is there.
13  Q  Okay.  So let's turn back to the first page.  In
14     the -- the second category, the second section right
15     about here, it says "Sponsor Information."
16  A  Yes, um-hmm.
17  Q  And under "Sponsor Name," it says "Embassy of the United
18     Arab Emirates," do you see that?
19  A  Um-hmm.
20  Q  Yes?
21  A  Yes.  I'm sorry.
22  Q  And the sponsor, as you understood it, was Ambassador
23     Otaiba of the United Arab Emirates?
24  A  I only see Embassy of the United Arab Emirates.
25  Q  And your contact at the embassy was Ambassador Otaiba?

Page 63
1  Q  I'm handing you what's been marked as Exhibit 2, which
2      is a Proposal Approval Form from the University of
3      Michigan, and do you know what a Proposal Approval Form
4      is?
5  A  Not really.
6  Q  Well, I will have you turn to the very last page.  This
7      is an electronic document and it says at the top,
8      "Received PI Signatures:  Person, Sherman Jackson."
9  A  The last -- the last --
10  Q  Up at the very top.  See where it says, "Received PI
11     Signatures"?
12  A  Oh, I see, "Received PI Signatures," okay.
13  Q  "Person, Sherman Jackson"?
14  A  Um-hmm.
15  Q  And you were the principal investigator for the World
16     Leadership Program, correct?
17  A  Um-hmm.
18  Q  Yes?
19  A  Yes.
20  Q  And the date that you signed off on the project approval
21     form was 2/23/2010, according to this document?  And
22     that's on the right-hand side, you can see where it says
23     the date signed?
24  A  Yes.
25  Q  Do you remember signing any forms with respect to the

Page 65
1  A  Yes, my understanding is that yes.
2  Q  Yeah.  It was Ms. Cone's contact, but you understood
3      that was the sponsor, correct?
4  A  Well, that's who Mark and I sent the letter establishing
5      that U of M would house the project to, Ambassador
6      Otaiba, yes.
7  Q  Okay, good.  So next to "Sponsor URL," there is a
8      description.  It says, "There are no guidelines.
9      Discretion has been delegated to the Principal
10     Investigator Sherman Jackson as to how to spend the
11     funds.  This is money on behalf of the UAE government
12     for a program."
13  A  Um-hmm.
14  Q  And is it true that for the World Leadership Program as
15     of February 2010, there were no guidelines?
16  A  Other than my understanding what was indicated in the
17     letter to Ambassador Otaiba.
18  Q  So there were guidelines in the letter?
19  A  Yes, in my understanding, that these funds would be used
20     for the program according to a budget, with the
21     exception of certain adjustments as consistent with that
22     arrangement.
23  Q  So you understood that there was a budget and an
24     agreement to abide by that budget?
25  A  Yes, basically, yes.

MARGARET CONE vs MARK TESSLER et al

Sherman Jackson on 10/09/2017 Non-Confidential

Job 5380
Pages 66..69

Page 66

1  Q  This says that there's no guidelines. That's
2     inconsistent, is it not?
3  A  If by no guidelines it negates what I just said, I guess
4     that's inconsistent.
5  Q  Well, according to the -- to the eResearch system, you
6     certified this Proposal Approval Form saying that there
7     are no guidelines. Did you do that?
8  A  Not to my recollection.
9  Q  So you would not have said there are no guidelines, is
10    that right?
11 A  Not to my recollection.
12 Q  That's -- that would be a false statement if guidelines
13    were following a budget?
14 A  Are you asking me if that's a false statement or are you
15    asking me if I made a false statement?
16 Q  Is it a false statement?
17 A  I would assume that it was a false statement.
18 Q  Discretion -- the next line says, "Discretion has been
19    delegated to the Principal Investigator Sherman Jackson
20    as to how to spend the funds."
21 A  Um-hmm.
22 Q  Was -- is that statement entirely truthful?  To your
23    recollection?
24 A  Well, I see that statement in construct with the first
25    statement, and if the implication here is that complete

Page 67

1     discretion was left to the PI, that would not have been
2     my understanding of what Mark Tessler and I had
3     indicated to Ambassador Otaiba.
4  Q  And in fact, you recall that you had indicated to
5     Ambassador Otaiba that adjustments to the budget would
6     be made in consultation with Ms. Cone --
7  A  Yes, something like that --
8  Q  -- and Mr. Tessler?
9  A  -- I think that -- I think, yes, I think that
10    was -- that's generally the wording, I think.
11 Q  And were there any adjustments that you made to the
12    budget without consulting Ms. Cone?
13 A  Not to my recollection.
14 Q  So if you go down a little bit further, you'll see it
15    says "Project Personnel" on the left, "UM
16    Investigators"?
17 A  Um-hmm.
18 Q  And then it has you as UM principal investigator --
19 A  Um-hmm.
20 Q  -- do you see that?
21 A  Um-hmm.
22 Q  Yes?
23 A  Yes.  Sorry.
24 Q  And underneath that, it says, "Mark Tessler,
25    Participating Investigator with Specified Effort," and

Page 68

1     do you know what that means?
2  A  No.
3  Q  And over on the far right, it says, "CPS - Center for
4     Political Studies," at the end of the row, and then it
5     has both your name --
6  A  Um-hmm.
7  Q  -- and Mr. Tessler's name.
8     At that time, you did not have an appointment at
9     CPS, is that right?
10 A  That's correct, I did not have an appointment.
11 Q  Do you recall when you got an appointment at CPS, if
12    ever?
13 A  I don't ever recall getting an appointment at CPS.
14 Q  Do you recall agreeing to an appointment at CPS?
15 A  I do not recall agreeing to an appointment at CPS.
16 Q  So there's a section right below that that says
17    "Ineligible Job Code Comments" where it says, "Sherman
18    Jackson, Faculty Associate," and then on "Ineligible Job
19    Comments," it says, "We are in the process of appointing
20    Professor Sherman Jackson as a Faculty Associate."
21    Do you remember reviewing that previously?
22 A  I do not.
23 Q  Do you know what that meant --
24 A  I --
25 Q  -- or means?

Page 69

1  A  I do not.  Oh.  Well, I mean, in general I know what it
2     means, but --
3  Q  With respect to the World Leadership Program?
4  A  Well, I assume that what it means is that they were
5     going to give me some kind of dry appointment, but I
6     don't have any recollection of this.
7  Q  Did you ever inform anyone at the UAE that you were
8     going to have an appointment at CPS related to the World
9     Leadership Program?
10 A  No.
11 Q  Can you think of any reason why the Center for Political
12    Studies would potentially not be a proper home for the
13    World Leadership Program?
14 A  Not to my knowledge.
15 Q  Let me have you turn the page.
16 A  Okay.
17 Q  At the -- at the top, it identifies David Howell.  Let
18    me just ask, when was the first time that you met
19    Mr. Howell in relation to the World Leadership Program,
20    if you recall?
21 A  When the arrangement was made to meet at CPS between
22    myself, Mark Tessler, Ms. Cone, and for some reason, I
23    recall one other person, but I'm blanking --
24 Q  Nancy Burns maybe?
25 A  Maybe, maybe.

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

Job 5380
Pages 74..77

Page 74

1 made with Ambassador Otaiba, that I would have seen some
2 inconsistency between those two.
3 Q Okay. This goes on to say, "A memorandum describing
4 this arrangement and how it was arrived at is attached
5 as a supplemental document to the PAF." That's short
6 for Proposal Approval Form.
7 Do you remember a memorandum a describing the
8 arrangement regarding an indirect costs model?
9 A To who?
10 Q To be attached to the PAF submitted for approval by the
11 U of M?
12 A I do not.
13 Q Okay. Do you recall agreeing to adjustments to the
14 budget relating to an indirect cost or fee-based
15 arrangement?
16 A This is a complicated question inasmuch as I do recall
17 that there was some discussion about revising the
18 budget. Now, whether that is what you're asking about
19 here, I mean, I don't know, and I would -- I don't know.
20 But outside of that, no, I don't recall any other.
21 Q So as of February of 2010, had you agreed to modify the
22 budget to use a fee-based arrangement?
23 A I recall that there was a discussion about modifying the
24 budget. My understanding at that time was that was for
25 the purpose, if I recall correctly, of getting Ms. Cone

Page 75

1 paid for certain things that had already been paid for
2 and that that would have to be -- the budget would have
3 to be revised in order to do that, but it was not my
4 understanding, I don't recall any agreement to shift
5 entirely to sort of a fee-based arrangement, I don't
6 recall that.
7 Q And as of February 2010, do you remember discussing or
8 writing Ambassador Otaiba about making such adjustments?
9 A I do not.
10 Q Did you rely on Mark Tessler to get the proper approvals
11 of such adjustments?
12 A I -- well, which adjustments are you talking about, the
13 ones I just mentioned to get Ms. Cone paid, or just in
14 general?
15 Q In general, adjustments to the budget that had been
16 agreed upon with Ambassador Otaiba, how did you go about
17 agreeing to adjustments to that --
18 A Oh, no, I -- I -- I assumed that there were certain
19 rules within the university that CPS was responding to
20 and that they would modify the budget in order to make
21 it consistent with those rules and to get Ms. Cone paid.
22 Q So you expected Mark Tessler to ensure that the rules
23 were followed with respect to changes to the budget?
24 A I -- I assumed that the personnel at CPS would follow
25 the rules, but that Mark Tessler's sort of endorsement

Page 76

1 of CPS sort of represented that the rules would be
2 followed.
3 Q So who was responsible for making sure the rules were
4 followed?
5 A Well, my understanding was that CPS would be making sure
6 that the rules would be followed.
7 Q Okay. Who at CPS?
8 A I assume Dave Howell.
9 Q Okay. Do you know what they say about assuming?
10 A What do they say about assuming?
11 Q Did you do anything other than assume, did you ever try
12 to follow up and make sure that in fact the rules were
13 being followed, or did you just assume?
14 A In the absence of what would appear to me to be
15 irregularity, yeah, I assumed.
16 Q But if you had seen this Proposal Approval Form saying
17 things like there are no guidelines, that would have
18 been an irregularity?
19 A I think that that would have been an irregularity, but I
20 don't recall seeing this.
21 Q So if you turn the page, the first full sentence
22 says -- and this is Cone 835 -- "The fee is distributed
23 to" --
24 A The first full sentence?
25 Q Yeah, the first full sentence.

Page 77

1 A "The fee," okay.
2 Q "The fee is distributed to CPS in equal installments
3 each project month. This has been agreed to between
4 CPS, the funder, and the Principal Investigators."
5 Do you -- that is, according to the testimony that
6 we've just discussed, that's not correct, is that right?
7 A I don't recall that being -- I don't recall that being
8 correct.
9 Q So that's an inaccurate statement about the status of
10 the project as of February 2010?
11 A Looks that way to me.
12 Q Do you remember a fee being distributed to CPS in equal
13 installments each project month?
14 A I do not recall.
15 Q Did you approve that?
16 A I don't recall.
17 Q So scrolling down a little bit here, we've got a section
18 that says "Effort" --
19 A Um-hmm.
20 Q -- and then it's got "Sherman Jackson, Faculty
21 Associate," with "Role, UM Principal Investigator," and
22 then for "Proposed Effort," it says "Summer, zero
23 percent, Calendar Year 25 percent," do you see that?
24 A Um-hmm.
25 Q Yes?

Page 82

1     school.
2  Q  Okay.
3  A  I --
4  Q  Well, I'll represent to you that the code U029255 is the
5     World Leadership Project.
6  A  Okay.
7  Q  And is it --
8  A  Oh, I see, visiting professor, here down -- okay.
9  Q  Yeah. I think that's the law school --
10 A  Okay.
11 Q  -- the 25 percent.
12 A  Okay, okay.
13 Q  And the law school is 25 percent effort for 12 months a
14    year, correct?
15 A  Um-hmm.
16 Q  Yes?
17 A  Yes.
18 Q  And the --
19 A  That's my understanding.
20 Q  Okay. So let's see if this effort reporting is -- is
21    accurate.
22    Did you spend 75 percent of your effort from
23    June 1st, 2009, to August 31st, 2009, on the World
24    Leadership Project?
25 A  From June 1st, 2009, to August 1st, 2009?

Page 83

1  Q  August 31st, 2009. I'm sorry if I misspoke, so let me
2     reiterate that.
3     Did you spend 75 -- is it accurate to say that you
4     spent 75 percent of your effort from June 1st, 2009,
5     through August 31st, 2009, on the World Leadership
6     Program?
7  A  Okay. This is a complicated answer.
8  Q  Can you answer it yes or no?
9  A  I can answer it yes or no with an explanation.
10 Q  Okay. Is the answer yes or no?
11 A  No, with an explanation.
12 Q  Okay. Let's just we'll do the other dates and then
13    we'll get the explanation.
14 A  Okay.
15 Q  Is it correct to say that from August 1st, 2009, through
16    May 31st, 2010, that you spent zero percent effort on
17    the World Leadership Program?
18 A  From August 1st, 2009, to?
19 Q  May 31st, 2010, is it accurate to say you spent
20    zero percent effort on the World Leadership Program?
21 A  I would say no.
22 Q  From June 1st, 2010, through July 31st, 2010, is it
23    accurate to say that you spent 75 percent of your effort
24    on the World Leadership Program?
25 A  From June 1st --

Page 84

1  Q  2010.
2  A  -- 2010 to --
3  Q  To July 31st, 2010, is it accurate to say --
4  A  July -- 75 percent. 75 percent. No, with an
5     explanation.
6  Q  Okay. And August 1st, 2010, through August 31st, 2010,
7     is it accurate to say you spent 25 percent of your
8     effort on the World Leadership Program?
9  A  August 2010?
10 Q  Correct.
11 A  To --
12 Q  August 31st, 2010.
13 A  Is it fair to say I spent how much?
14 Q  25 percent.
15 A  I would say no.
16 Q  Okay. And so with respect to those entries, why would
17    you say no, it's not accurate?
18 A  Well, the problem I have for summer dates, my salary at
19    the University of Michigan was computed on a 12-month
20    basis, but I had no teaching or administrative
21    obligations within the summer, so the question becomes
22    whatever I do in the summer, how would you calculate it
23    relative to what I'm supposed to be doing if I'm not
24    supposed to be doing anything? If I'm not obligated to
25    do anything.

Page 85

1  Q  You understand what effort reporting is, correct?
2  A  I'm assuming I have a straightforward understanding of
3     that.
4  Q  And did you have an understanding of what effort
5     reporting was when you were at the University of
6     Michigan?
7  A  For my teaching?
8  Q  For your employment with the University of Michigan.
9  A  No, other than annual reports stating what courses I
10    taught, et cetera.
11 Q  And did you --
12 A  But nothing --
13 Q  -- understand that you had to be truthful in -- with
14    respect to your effort reporting?
15 A  Yes.
16 Q  And that you had to be accurate with respect to your
17    effort reporting?
18 A  As accurate as possible.
19 Q  And that there could be federal, civil, or criminal
20    penalties if those effort reports were falsified or
21    inaccurate?
22 A  It never crossed my mind.
23 Q  Because they were always accurate, is that right?
24 A  What -- the reports that I submitted, to my knowledge,
25    yes.

MARGARET CONE vs MARK TESSLER et al                                                      Job 5380
Sherman Jackson on 10/09/2017 Non-Confidential                                        Pages 108..111

Page 108
1     was made to the sponsor?
2  A  I thought that's what you presented earlier this
3     morning.
4  Q  Um-hmm. So Exhibit 1, the attachment to Exhibit 1 is
5     the proposal?
6  A  That was my understanding of what Ms. Cone presented to
7     Ambassador Otaiba.
8  Q  And you received a copy, correct?
9  A  I think so. At some point, I'm not sure when.
10 Q  And you didn't ever say that that proposal form was
11    inaccurate or that something was wrong with it?
12 A  Which proposal form?
13 Q  The one that is attached to Exhibit 1.
14 A  You mean this?
15 Q  Yes.
16 A  But I -- is this the proposal form?
17 Q  Is it? Or do you understand whether or not that's the
18    proposal or not?
19 A  Wait a minute, but I -- I'm confused.
20 Q  Um-hmm.
21 A  I thought the proposal form was a PAF.
22 Q  Okay. Let me -- yeah, let me -- I'm talking about the
23    proposal.
24 A  Uh-huh.
25 Q  So at some point, a proposal was made to the sponsor,

Page 110
1  A  Five?
2  Q  -- 5, thank you. And "Proposal Documents" on this first
3     page that we were just looking at, it says
4     "ProposalNoteForPAF." And if you turn the page, this is
5     the proposal note, and this says, "Proposal: Please
6     note that no proposal is to be submitted to the sponsor.
7     We already have the funds for this and the account just
8     needs to be set up. See the attached proposal documents
9     for further information."
10    Did you make that decision about whether or not
11    there was a proposal document that should be attached to
12    the Proposal Approval Form --
13 A  No.
14 Q  -- or the project approval form?
15 A  No.
16 Q  Did you draft this?
17 A  No, I did not.
18 Q  Was it accurate that no proposal is to be submitted to
19    the sponsor?
20 A  That would not have been my understanding.
21 Q  In fact, a proposal had been submitted to the sponsor?
22 A  That would be my understanding.
23 Q  Let me turn you to the next page then. This is a
24    Memorandum from David Howell regarding justification for
25    indirect cost recovery on World Leadership Program,

Page 109
1     correct?
2  A  Yes.
3  Q  That proposal is what's attached to Exhibit 1?
4  A  I'm assuming that, yes.
5  Q  Do you know whether or not that is in fact the case or
6     are you just assuming that?
7  A  Well, my understanding was that Ms. Cone crafted this
8     and sent it to Ambassador Otaiba.
9  Q  And you did not --
10 A  I did --
11 Q  -- make changes?
12 A  I don't recall making any changes. I don't recall.
13 Q  Okay. Do you have any reason to say that the proposal
14    that you received in October and that was forwarded to
15    the ambassador was somehow inaccurate as to what the
16    proposal was?
17 A  There's a whole lot of stuff in there. I'd have to go
18    over it.
19 Q  Okay. So you don't recall responding to that email or
20    communicating with Ms. Cone about that proposal prior to
21    October and prior to it being sent to the ambassador?
22 A  I don't recall. I'm not negating that. I don't recall.
23 Q  Okay. And no, I'm not going to ask you to read it and
24    tell me what's accurate and inaccurate right now. I
25    will, however, turn you back to Exhibit --

Page 111
1     date, February 24th, 2010.
2  A  Um-hmm.
3  Q  Do you recall reviewing or approving a memorandum
4     regarding justification for indirect cost recovery that
5     David Howell prepared?
6  A  I don't recall specifically. I recall some conversation
7     around that topic involving myself, I think it was, Dave
8     Howell, and Ms. Cone, I think.
9  Q  Was that during the meeting in Ann Arbor in --
10 A  No, I don't think it was during the meeting in
11    Ann Arbor.
12 Q  It was on the telephone --
13 A  No, not --
14 Q  -- before that?
15 A  I think there were -- I think there were some -- there
16    may have been some email exchanges about that. I think
17    that this is where we got into the whole business of
18    adjustments to the budget so that Ms. Cone could get
19    paid. I may be wrong, but that's my understanding.
20 Q  You think that Ms. Cone was compensated through indirect
21    cost recovery?
22 A  I don't know if it was indirect cost recovery, but I
23    know that there had to be an arrangement made for her to
24    get paid, and that entailed some kind of adjustment to
25    the budget.

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

**Page 112**

1 Q Okay. Well, I can tell you indirect cost recovery is
2 not related to Margaret Cone's compensation, but you'll
3 see this first sentence says, "This memorandum is to
4 detail the process for arriving at the effective
5 indirect cost recovery on the World Leadership Program
6 project which has Sherman Jackson as principal
7 investigator."
8 A Um-hmm.
9 Q And it says that, "In discussions between the project
10 leadership --" and let me just pause right there.
11 The project leadership is yourself, Mark Tessler,
12 and Ms. Cone?
13 A Um-hmm.
14 Q Is that correct?
15 A I assume that, I --
16 Q And the sponsor or not the sponsor? Well, actually, it
17 goes on, "and the representatives of the funding
18 organization."
19 That would be Ambassador Otaiba, correct?
20 A I assume yes.
21 Q Do you -- okay. Do you know one way or another?
22 A Well, I mean, Ambassador Otaiba was the one with whom we
23 communicated. How they distributed that within the UAE
24 embassy, I don't know.
25 Q Were there any other representatives of the funding

**Page 113**

1 organization that you had contact with?
2 A No.
3 Q And you only had contact with the representative of the
4 funding organization in writing?
5 A Yes.
6 Q So it goes on to say, "It became clear that a fee-based
7 model would be more familiar and comfortable to the
8 funder than an indirect cost-based model."
9 A Um-hmm.
10 Q Is that information that you shared with David Howell?
11 A I don't recall sharing that information.
12 Q Was it clear to you that a fee-based model would be more
13 familiar and comfortable to the funder?
14 A I could not say that, no. One way or the other.
15 Q Is that language then that David Howell came up with on
16 his own, do you know?
17 A I don't recall contributing anything to this language.
18 Q Okay. Was it accurate or inaccurate that a fee-based
19 model had become clear as the more familiar and
20 comfortable model to the funder?
21 A I can't answer that question one way or the other.
22 Q Who would be able to answer that question?
23 A The person who drafted this memo, I assume.
24 Q Okay. And did David Howell have any communications with
25 the funding organization?

**Page 114**

1 A I don't know.
2 Q Did you ever authorize him to contact the funding
3 organization?
4 A Specifically, I don't recall doing so.
5 Q Did you ever ask him to?
6 A I don't recall ever asking him to.
7 Q Okay. Who do you know was in contact with the funder?
8 A I assume that Ms. Cone was in contact with the funder.
9 Q Okay. And do you recall Ms. Cone ever telling you that
10 it had become clear that a fee-based model would be more
11 familiar?
12 A I do not.
13 Q This goes on to say at the fifth line from the bottom in
14 the middle, you'll see it says, "The model works," it
15 explains how the model works, and --
16 A Oh, in the first paragraph.
17 Q The second para -- yeah. It says, "The model works such
18 that the fee is distributed from the project to the
19 Center for Political Studies in equal installments at
20 the beginning of each month of the project, so that by
21 the time of project completion the fee will have been
22 distributed from the project to the Center in full."
23 Was that your understanding of how this model
24 works?
25 A Which, the fee-based model?

**Page 115**

1 Q Yes.
2 A I can't say, I was not -- I don't recall being privy to
3 these conversations at the time. Again, I do recall
4 some discussion about modifications to the budget based
5 on what I said earlier, if that recollection itself is
6 correct, but I don't recall being party to this
7 conversation.
8 Q You're -- do you recall in February approving a
9 fee-based model that worked as this describes?
10 A I can't negate that. I would -- I know that in the
11 conversations with Mark Tessler, the issue of how the
12 money would come and be distributed, that was one of the
13 issues that was under discussion as part of the reason
14 for bringing in CPS to begin with, so I can assume that
15 what they arrived at I probably approved.
16 Q Okay. So is it your testimony that as of February 24th,
17 you had approved a fee-based model?
18 A Well, I can only assume that, I mean, if this is the
19 basis upon which it was finally decided that they would
20 proceed.
21 Q You don't have a recollection one --
22 A I don't.
23 Q -- way or another?
24 A I don't.
25 Q You don't know if you approved this model?

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

Page 124

1   Q   Okay. Let's turn to 2458. Did you participate in
2       drafting a letter to Dr. Tayyeb at Al-Azhar University?
3   A   I recall a letter to Dr. Tayyeb in which Mark and I
4       were, I think, co-signers or something like that on.
5   Q   And this letter went out on International Institute
6       letterhead, correct?
7   A   I believe so.
8   Q   And Mark had a -- an association with the International
9       Institute, correct?
10  A   Yes, he was on -- in my understanding, he was director.
11  Q   And in fact --
12  A   Or vice-provost.
13  Q   -- underneath -- yes. Underneath the signature, it
14      says, "Director, International Institute," correct?
15  A   Um-hmm.
16  Q   And it also says, "Vice-Provost for International
17      Affairs," correct?
18  A   Yes.
19  Q   It doesn't say anything about CPS, does it?
20  A   I don't see anything.
21  Q   Under your name, it doesn't say anything about CPS, does
22      it?
23  A   No, it doesn't.
24  Q   And do you remember whether or not CPS was even being
25      considered as a home for the project in December of

Page 125

1       2009?
2   A   I can't recall dates. It was, I believe, after October
3       of 2009, but I can't recall exactly when.
4   Q   Okay. Well, CPS isn't mentioned anywhere in this
5       letter --
6   A   Um-hmm.
7   Q   -- is it?
8   A   No, not that I see.
9   Q   And if CPS was being considered as the home for the
10      project, would you have made sure that it was mentioned
11      in the letter?
12  A   If it had been at the time, I assume that it would have
13      been appropriate to mention it.
14  Q   And it would have been inappropriate to conceal that CPS
15      was being considered as the home, would it not?
16          MR. BOURQUE: Object to the form, misleading.
17          Go ahead.
18  A   It would have --
19          MR. JUCKNIESS: Misleading is not a proper
20      objection, as you know.
21          MR. BOURQUE: It is a proper objection.
22          MR. JUCKNIESS: No, it's not, not in Federal Court,
23      buddy.
24          MR. BOURQUE: Well, you can say that, fine. That's
25      okay, go ahead.

Page 126

1       MR. JUCKNIESS: All right.
2       MR. BOURQUE: I didn't tell him not to answer, did
3   I?
4       MR. JUCKNIESS: No, but if you want to coach him,
5   you know, you can take him out of the room.
6   BY MR. JUCKNIESS:
7   Q   Go ahead.
8       MR. BOURQUE: That's an inappropriate comment.
9       MR. JUCKNIESS: It's not an inappropriate comment.
10      MR. BOURQUE: I made a specific objection --
11      MR. JUCKNIESS: We'll go off the record.
12      MR. BOURQUE: -- with one word --
13      MR. JUCKNIESS: We can go off the record.
14      MR. BOURQUE: -- and told him to answer. We don't
15  need to go off the record.
16      MR. JUCKNIESS: Okay.
17      MR. BOURQUE: So he can answer the question. I've
18  made my objection.
19      MR. JUCKNIESS: Okay.
20  A   So I'm sorry, could you repeat the question?
21  BY MR. JUCKNIESS:
22  Q   Sure. It would have been inappropriate to conceal that
23      CPS was going to be the home for the program if it was
24      in December of 2009?
25  A   To conceal that --

Page 127

1       MR. BOURQUE: Same objections.
2   BY MR. JUCKNIESS:
3   Q   Yes.
4   A   To conceal that, I would assume that would be
5       inappropriate. Unless, unless there was an assumption
6       that CPS had some affiliation with -- with the
7       International Institute.
8   Q   Did CPS have an affiliation with the International
9       Institute?
10  A   I don't know.
11  Q   So the middle paragraph here, it starts, "Professor
12      Sherman Jackson of the University of Michigan will
13      oversee programming and operations at the University of
14      Michigan."
15  A   Um-hmm.
16  Q   Was that -- that was an accurate statement as of
17      December 14, 2009?
18  A   I would say yes.
19  Q   You had agreed to oversee programming and operations at
20      the University of Michigan, correct?
21  A   Yes.
22  Q   And you had done so in your capacity as a professor of
23      the law school, a professor of the LS&A school, or
24      something else?
25  A   No, as a professor at the University of Michigan. I

Page 128

1  think the -- the affiliation with the law school did not
2  come about until it was time for me to be paid.
3  Q  So who approved your agreement to oversee programming
4     and operations at the University of Michigan as of
5     December 2009?
6  A  That was my understanding of the -- oh. Who approved it
7     from the university?
8  Q  Yes.
9  A  I can't say anyone did, I don't know.
10 Q  Okay. Did you ask anyone for approval --
11 A  No.
12 Q  -- as of that time?
13 A  No.
14 Q  So you agreed to oversee programming and operations at
15    the University of Michigan, but didn't get approval from
16    anyone at the University of Michigan to make that
17    agreement?
18 A  I didn't know I had to.
19 Q  Okay. So you -- but you think you were agreeing on
20    behalf of the University of Michigan anyway?
21 A  I was agreeing as an employee of the University of
22    Michigan. I mean, I had no infrastructure of my own.
23 Q  And you had authority to agree on behalf of the
24    University of Michigan to oversee programming and
25    operations of the program?

Page 129

1  A  I don't -- I don't know, I'm not sure.
2  Q  Did you know at the time?
3  A  I -- it didn't ever cross my mind.
4  Q  So you didn't know whether or not you had authority to
5     make this agreement at the time that you made it?
6  A  The agreement with Ambassador Otaiba? Or with
7     Dr. Tayyeb?
8  Q  Either.
9  A  Okay. Well --
10 Q  Let's say with Mr. Tayyeb.
11 A  I assumed, quite frankly, that the University of
12    Michigan would look upon this program as
13    favorable -- favorably and that it would be welcomed at
14    the university.
15 Q  So you assumed they would approve?
16 A  As such approval that would be required.
17 Q  But they hadn't yet approved?
18 A  Not to my recollection.
19 Q  And you hadn't informed your bosses either at the LS&A
20    or at the law school about this program?
21 A  No, I had not.
22 Q  And they didn't know that you were going to oversee
23    programming and operations at the --
24 A  I don't know what they knew.
25 Q  You didn't tell them?

Page 130

1  A  I didn't tell them.
2  Q  Let's turn to 2459. This is a letter from Ambassador
3     Otaiba regarding the funding for the World Leadership
4     Program, correct?
5  A  Um-hmm.
6  Q  Yes?
7  A  Yes.
8  Q  And do you recognize it?
9  A  Generally, yes.
10 Q  So it says, "I have approved the budget submitted by
11    Margaret Cone."
12    Do you remember him approving the budget submitted
13    by Margaret Cone?
14 A  I remember this statement.
15 Q  Yes? And is that budget the one that's contained on
16    Exhibit 1?
17 A  This one?
18 Q  Yes, the one that was forwarded to --
19 A  I assume so.
20 Q  Yes. Do you know of any other budget that he was
21    referring to that would have been submitted by Margaret
22    Cone?
23 A  Well, I seem to recall that there were -- there were a
24    couple of iterations of that, but I think that this was
25    the one that was sort of finally settled upon, so I

Page 131

1     assume that this is the only one he got, but I can't be
2     absolutely certain of that.
3  Q  And it's your recollection that she submitted one budget
4     after the iterations to the ambassador?
5  A  That would be my assumption.
6  Q  So he goes on to say, "My contribution is contingent
7     upon the money being spent in accordance with the
8     budget, with reasonable adjustments as determined by
9     Professor Sherman Jackson. I understand that Professor
10    Jackson at the University of Michigan will be
11    responsible for directing disbursement of the funds from
12    my contribution, in consultation with Ms. Cone and I
13    also understand that under established university
14    policies, a reasonable portion of my contribution may be
15    allocated to overhead expenses."
16 A  Um-hmm.
17 Q  That was accurate to your understanding of what the
18    agreement was regarding the expenditure of funds for the
19    World Leadership Program?
20 A  I think basically.
21 Q  That you were responsible for directing disbursements?
22 A  Overseeing disbursements.
23 Q  Well, this says "will be responsible for directing
24    disbursement"?
25 A  Okay.

Page 144

1  A  I don't remember it, per se.
2  Q  Okay. In the second line, Tessler writes, "I have
3      shared your letter with Professor Jackson, with whom I
4      am in regular contact about this project. We are both
5      very grateful for your support."
6          So you were sharing everything at that time with
7      Professor Tessler and he was sharing back with you the
8      information that he had on the project?
9  A  I don't know about everything, but I think that at that
10     time, there were still discussions about the exact
11     modality by which the University of Michigan would host
12     the program and there were still those -- some of those
13     outstanding issues that were initially raised with
14     Ms. Cone.
15  Q  Okay.
16  A  That's my recollection.
17  Q  All right. And so in the next paragraph it says, "The
18     conditions outlined in your letter are completely
19     acceptable."
20         The conditions outlined in the ambassador's letter,
21     were they acceptable to you?
22  A  They seemed acceptable, yes.
23  Q  And did you -- you did not get any explicit approval,
24     though, from anyone at the university for those
25     conditions outlined in the letter?

Page 145

1  A  No.
2  Q  Do you know if Mark Tessler got approval from anyone at
3      the university?
4  A  I do not.
5  Q  Did you ask him if he got the proper --
6  A  I did not.
7  Q  -- approval?
8  A  I did not.
9  Q  As the principal investigator, did you understand that
10     you were responsible to get the proper approval?
11         MR. BOURQUE: Objection. Misstates the evidence.
12         Go ahead.
13  A  I --
14         MR. JUCKNIESS: Misstates the evidence isn't a
15     proper objection.
16  BY MR. JUCKNIESS:
17  Q  Go ahead.
18         MR. JUCKNIESS: Form is the proper objection.
19         MR. BOURQUE: Well, then I have to explain the
20     reason that the form is improper.
21         MR. JUCKNIESS: Only if I ask for it.
22         MR. BOURQUE: No.
23         MR. JUCKNIESS: Yeah.
24         MR. BOURQUE: Show me in the rules where that says
25     that.

Page 146

1          MR. JUCKNIESS: I'll do that.
2          MR. BOURQUE: Okay. Just like you did the last
3      one. Go ahead.
4  A  I'm sorry, your question again?
5  BY MR. JUCKNIESS:
6  Q  Yeah. You understand that as principal investigator on
7      the World Leadership Project, you were the one
8      responsible for getting approvals from the university?
9          MR. BOURQUE: Same objection to the question.
10  A  At the time, no, I was not aware of that responsibility.
11  BY MR. JUCKNIESS:
12  Q  Um-hmm. Are you aware of that responsibility now?
13  A  Not really, other than -- other than what's been said
14     here.
15  Q  Okay. Did anyone at the International Institute tell
16     you that the conditions outlined in the Otaiba letter
17     were completely acceptable?
18  A  I think other than Mark Tessler, no.
19  Q  No one other than Mark Tessler, correct? No one at the
20     LS&A approved those conditions, correct?
21  A  Not to my knowledge.
22  Q  No one at the law school to your knowledge approved
23     those conditions?
24  A  No.
25  Q  And no one else at the university approved those

Page 147

1      conditions?
2  A  Not to my knowledge.
3  Q  Mark Tessler goes on to write, "I would only add that
4      decisions about the disbursement of funds will be made
5      by Professor Jackson in consultation with me as well as
6      Margaret Cone."
7          And you -- you reviewed that at the time?
8  A  Reviewed what at the time?
9  Q  Reviewed this letter at the time?
10  A  Again, I think that that was a general understanding
11     among us.
12  Q  And so you had agreed that decisions about disbursements
13     would be made in consultation with Tessler and Margaret
14     Cone?
15  A  Yes.
16  Q  Were there any circumstances under which you violated
17     that requirement?
18  A  Not to my knowledge.
19  Q  The last line says that, "We are deeply grateful for
20     your support and look forward to keeping in touch as the
21     project moves forward."
22         As of October 30th, 2009, the only communications
23     that you had had were the correspondence that we've
24     looked at today?
25  A  To my knowledge, yes.

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

Job 5380
Pages 144..147

Page 144

1  A  I don't remember it, per se.
2  Q  Okay. In the second line, Tessler writes, "I have
3      shared your letter with Professor Jackson, with whom I
4      am in regular contact about this project. We are both
5      very grateful for your support."
6          So you were sharing everything at that time with
7      Professor Tessler and he was sharing back with you the
8      information that he had on the project?
9  A  I don't know about everything, but I think that at that
10     time, there were still discussions about the exact
11     modality by which the University of Michigan would host
12     the program and there were still those -- some of those
13     outstanding issues that were initially raised with
14     Ms. Cone.
15 Q  Okay.
16 A  That's my recollection.
17 Q  All right. And so in the next paragraph it says, "The
18     conditions outlined in your letter are completely
19     acceptable."
20         The conditions outlined in the ambassador's letter,
21     were they acceptable to you?
22 A  They seemed acceptable, yes.
23 Q  And did you -- you did not get any explicit approval,
24     though, from anyone at the university for those
25     conditions outlined in the letter?

Page 146

1          MR. JUCKNIESS:  I'll do that.
2          MR. BOURQUE:  Okay. Just like you did the last
3      one. Go ahead.
4  A  I'm sorry, your question again?
5  BY MR. JUCKNIESS:
6  Q  Yeah. You understand that as principal investigator on
7      the World Leadership Project, you were the one
8      responsible for getting approvals from the university?
9          MR. BOURQUE:  Same objection to the question.
10 A  At the time, no, I was not aware of that responsibility.
11 BY MR. JUCKNIESS:
12 Q  Um-hmm. Are you aware of that responsibility now?
13 A  Not really, other than -- other than what's been said
14     here.
15 Q  Okay. Did anyone at the International Institute tell
16     you that the conditions outlined in the Otaiba letter
17     were completely acceptable?
18 A  I think other than Mark Tessler, no.
19 Q  No one other than Mark Tessler, correct? No one at the
20     LS&A approved those conditions, correct?
21 A  Not to my knowledge.
22 Q  No one at the law school to your knowledge approved
23     those conditions?
24 A  No.
25 Q  And no one else at the university approved those

Page 145

1  A  No.
2  Q  Do you know if Mark Tessler got approval from anyone at
3      the university?
4  A  I do not.
5  Q  Did you ask him if he got the proper --
6  A  I did not.
7  Q  -- approval?
8  A  I did not.
9  Q  As the principal investigator, did you understand that
10     you were responsible to get the proper approval?
11         MR. BOURQUE:  Objection. Misstates the evidence.
12     Go ahead.
13 A  I --
14         MR. JUCKNIESS:  Misstates the evidence isn't a
15     proper objection.
16 BY MR. JUCKNIESS:
17 Q  Go ahead.
18         MR. JUCKNIESS:  Form is the proper objection.
19         MR. BOURQUE:  Well, then I have to explain the
20     reason that the form is improper.
21         MR. JUCKNIESS:  Only if I ask for it.
22         MR. BOURQUE:  No.
23         MR. JUCKNIESS:  Yeah.
24         MR. BOURQUE:  Show me in the rules where that says
25     that.

Page 147

1      conditions?
2  A  Not to my knowledge.
3  Q  Mark Tessler goes on to write, "I would only add that
4      decisions about the disbursement of funds will be made
5      by Professor Jackson in consultation with me as well as
6      Margaret Cone."
7          And you -- you reviewed that at the time?
8  A  Reviewed what at the time?
9  Q  Reviewed this letter at the time?
10 A  Again, I think that that was a general understanding
11     among us.
12 Q  And so you had agreed that decisions about disbursements
13     would be made in consultation with Tessler and Margaret
14     Cone?
15 A  Yes.
16 Q  Were there any circumstances under which you violated
17     that requirement?
18 A  Not to my knowledge.
19 Q  The last line says that, "We are deeply grateful for
20     your support and look forward to keeping in touch as the
21     project moves forward."
22         As of October 30th, 2009, the only communications
23     that you had had were the correspondence that we've
24     looked at today?
25 A  To my knowledge, yes.

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

Job 5380
Pages 156..159

Page 156

1    MR. BOURQUE: Keep them all in one place.
2    THE WITNESS: Okay. Is this okay?
3  BY MR. JUCKNIESS:
4  Q  Thank you, yes. I'm just kind of keeping 1 aside just
5    in case we have to refer back to it.
6      So Exhibit 13 is an email chain. There's an email
7    at the -- at the very bottom, or at least it appears to
8    be that one of them in the chain is from you to Mark
9    Tessler and a cc to Margaret Cone --
10 A  Um-hmm.
11 Q  -- on November 3rd.
12 A  Um-hmm.
13 Q  Did you draft that email?
14 A  As far as I can tell.
15 Q  Do you recall drafting it?
16 A  Yes, vaguely.
17 Q  And do you recall emailing it to Mark Tessler and to
18    Margaret Cone?
19 A  Vaguely.
20 Q  Did you in fact email it to Margaret Cone?
21 A  I believe so.
22 Q  And it says, "Anyway" -- this is the third line,
23    "Anyway, I am attaching the," asterisk, "working,"
24    closed asterisk, "budget for the WLP project."
25      Did you -- was it your understanding as of

Page 157

1    November 3rd that there -- that there was just a working
2    budget and not an agreed-upon budget?
3  A  I think that by that time, the question had become,
4    again, how -- how the -- how the issue of U of M's role
5    as host and administrator would be -- how the budget
6    would be accommodated to that, that fact.
7  Q  But you had already agreed on a budget with the
8    ambassador and the sponsor, correct?
9  A  I believe that's correct.
10 Q  Do you recall -- then this on that first page, the email
11    from Mark Tessler to you and it says cc Margaret Cone,
12    and you'll see in the fourth paragraph, it says, "On the
13    budget, the biggest question is whether we run it
14    through CPS (the center Nancy directs) or some place
15    else. CPS is by far easier and better set up to handle
16    this, they administer the Qatar grant, as I think you
17    know, as well as many others. And I checked with our
18    business manager at the International Institute; it
19    would be extremely difficult for II to take on all the
20    administration and budget management that will be
21    required."
22      Do you recall reviewing that at the time?
23 A  When you say "reviewing," you mean reading?
24 Q  Yes.
25 A  I don't recall reading it at the time, but it

Page 158

1    looks -- looks like consistent with conversations that
2    Mark and I had.
3  Q  But as of the date of this email, the International
4    Institute had already agreed to the budget that had been
5    provided by Ambassador Otaiba as you understood it,
6    correct?
7  A  I believe so.
8  Q  And so did you question why we would move it away from
9    the International Institute and toward CPS?
10 A  Well, I didn't have cause to question it because Mark
11    explained that to me.
12 Q  Okay. And as of November 3rd, it hadn't been decided?
13 A  Apparently not. I don't know the exact dates on which
14    these --
15 Q  Well, this is supposedly November 3rd.
16 A  Okay.
17 Q  So as of November 3rd, that was still the biggest
18    question, whether to run it through CPS?
19 A  It looks that way.
20 Q  Do you remember what Margaret Cone's response was to
21    this?
22 A  Not off the top of my head.
23 Q  When was the first time you discussed CPS with Margaret
24    Cone?
25 A  I think in an email to her. I don't know what the date

Page 159

1    was.
2  Q  February maybe of 2010?
3  A  I don't know.
4  Q  You don't recall getting on the phone and discussing
5    with Margaret Cone in November that the project was
6    going to be moved from the International Institute --
7  A  I don't recall -- I'm sorry. I don't recall that.
8  Q  You didn't think that was important?
9  A  Well, it was still a matter that was developing, I mean,
10    nothing had been done there, but I guess it didn't cross
11    my mind that -- I felt -- I guess I felt that my
12    understanding from Ms. Cone had been that it was
13    important to get this program housed and that if the
14    International Institute for some reason could not, then
15    it would be good to find another place within U of M to
16    do it. I guess that was part of my understanding.
17 Q  All right. In the last paragraph, Mark says, "It's
18    exciting that this is finally taking shape. Although
19    you are Principal Investigator, and as I understand it
20    Margaret should be thought of as co-PI, I hope to be
21    involved myself."
22      Did you -- you agreed with that, that you were the
23    principal investigator and Margaret was the co-PI, and
24    at that time, there was no official involvement of Mark
25    Tessler?

MARGARET CONE vs MARK TESSLER et al                                          Job 5380
Sherman Jackson on 10/09/2017 Non-Confidential                            Pages 172..175

Page 172

1  A  Not to my recollection, with the exception of Mark
2     Tessler as an officer of the university.
3  Q  So David Howell had gone on to say that he'll help you
4     get the funds transferred and the project more fully
5     underway. Had you informed David Howell that CPS would
6     be handling the funds and the project?
7  A  I don't recall, but there must have been some
8     conversation. Otherwise, that wouldn't make sense. But
9     I don't recall exactly how those conversations
10    transpired.
11 Q  Okay. So the email then that you respond, you respond
12    on November 30th and you say, "Dear Dave: Hope you had
13    a great Thanksgiving."
14       Had you met Dave Howell by this time?
15 A  When is this?
16 Q  In person? This is November 30th.
17 A  I think I met Dave Howell for the first time when
18    Ms. Cone and I and Mark Tessler and I think it was Nancy
19    Burns met at CPS, so --
20 Q  In February of 2010?
21 A  Was that February of 2010?
22 Q  Um-hmm.
23       MR. BOURQUE: You don't get to ask questions.
24       THE WITNESS: Oh, I'm sorry.
25 BY MR. JUCKNIESS:

Page 173

1  Q  You hadn't met him as of November 2009?
2  A  I don't -- I don't believe I had met him as of 2009.
3  Q  So the first paragraph says, "First, my co-PI would like
4     to negotiate a lower overhead deduction. She would like
5     to cap it at 20 percent."
6       So does that refresh your recollection you were
7     referring to Margaret Cone as --
8  A  Yes.
9  Q  -- the co-PI?
10 A  Yes.
11 Q  Okay. "She would like to cap it at 20 percent. I, on
12    the other hand, would be willing to meet in the middle
13    at 22.5 percent. With whom precisely should we take
14    this up?"
15       Did Margaret -- did Margaret actually tell you she
16    wants to cap the overhead at 20 percent?
17 A  If I wrote that, that must have been the result of
18    discussions I had with Margaret.
19 Q  You don't have a direct recollection of that being --
20 A  I don't.
21 Q  -- said?
22 A  No.
23 Q  Okay. And you were willing to go higher because why?
24 A  Again, as I said, I sensed a degree of urgency in
25    Margaret's desire to have the program housed,

Page 174

1     administered, and underway, so I thought that if there
2     would be a mutually agreeable compromise, that would
3     be -- that would be the best way forward.
4  Q  As of that time, there wasn't an agreement, though?
5  A  An agreement between?
6  Q  An agreement regarding the overhead?
7  A  Apparently not.
8  Q  With the sponsor?
9  A  Apparently not.
10 Q  The next paragraph is, "Second, I'm attaching a copy of
11    the letter to be sent to the UAE for your perusal and
12    advice."
13       You were sending that to Dave Howell's -- to Dave
14    Howell for his perusal and advice so that he could
15    comment on it on behalf of CPS?
16 A  I don't know.
17 Q  That's the only possible reason --
18 A  Yes, yes, I mean, that -- state your question again?
19    I'm sorry.
20 Q  You were sending it to him for his perusal and advice on
21    behalf of CPS?
22 A  Yes, I believe so.
23 Q  You wanted him to tell you what CPS wanted changed in
24    this document?
25 A  Well, whether or not these would be accurate wiring

Page 175

1     instructions, I guess.
2  Q  Okay. And at that time, you expected the wiring
3     instructions to be to CPS?
4  A  I'm not sure. I assume.
5  Q  Well, when did you -- do you recall the time when it was
6     finally decided that the money would go to CPS and not
7     to the International Institute?
8  A  I think that that -- I don't recall the exact time. I
9     thought that -- I don't recall the exact time.
10 Q  Do you recall how you exactly confirmed it with Margaret
11    Cone that it would be housed at CPS and that the money
12    would go there?
13 A  Again, I thought that was in an email exchange
14    that -- between myself, her, and Mark Tessler where that
15    was discussed.
16 Q  Do you remember getting any email from Margaret saying
17    yes, CPS is fine?
18 A  I don't remember that. I think that -- I don't remember
19    that.
20 Q  Do you remember ever asking her to provide anything in
21    writing that yes, it's fine to move it from
22    International Institute to CPS?
23 A  No, I don't recall that.
24 Q  Do you recall her objecting to moving it from the
25    International Institute to CPS?

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

Page 176

1  A  I don't recall that.
2  Q  As co-PI, she would have to approve a change like that,
3     wouldn't she?
4  A  I would assume.
5  Q  You can put that in the pile.
6  A  This one here?
7  Q  No, I'm sorry, that one.
8     (Exhibit 18 was marked for identification.)
9  BY MR. JUCKNIESS:
10  Q  Exhibit 18 is a letter dated December 1st, 2009, to
11     Ambassador Otaiba from you and Mark Tessler, correct?
12  A  Um-hmm.
13  Q  Yes?
14  A  Yes. Sorry.
15  Q  And this is -- this was from -- this is produced as
16     Jackson 243, so did this come off of your computer?
17  A  I assume it did.
18  Q  And so do you remember retaining a copy of this in your
19     electronic files?
20  A  Electronic files, you mean --
21  Q  Yeah, on your computer.
22  A  -- by which you mean email or just --
23  Q  Either?
24  A  No, not email, I -- these are downloaded files, saved
25     files.

Page 177

1  Q  All right. And this is a letter that you signed, this
2     is your signature at the bottom?
3  A  Yes.
4  Q  All right. And you signed as Professor of Afro-American
5     Studies, which is your posting at LS&A?
6  A  No, I signed as Arthur F. (Inaudible) --
7     COURT REPORTER: I'm sorry, could you slow down a
8     little?
9     THE WITNESS: Okay. I'm sorry.
10     COURT REPORTER: No, that's okay. Signed as?
11  A  Arthur F. Thurnau Professor of Arabic and Islamic
12     Studies, Visiting Professor of Law, Professor of
13     Afro-American Studies.
14  BY MR. JUCKNIESS:
15  Q  Okay. And that's the law school and LS&A, correct?
16  A  Yes.
17  Q  And not CPS, correct?
18  A  Correct.
19  Q  And you didn't have a posting at CPS at this time?
20  A  No, not to my knowledge.
21  Q  And you didn't have a posting at the International
22     Institute?
23  A  No.
24  Q  Mark Tessler likewise signs as the Eldersveld Collegiate
25     Professor of Political Science, Director, International

Page 178

1     Institute, and Vice-Provost for International Affairs,
2     but he doesn't identify the Center for Political
3     Studies, right?
4  A  I don't see it.
5  Q  It's not on CPS letterhead?
6  A  No.
7  Q  And did you intend for the ambassador to believe that
8     the International Institute was going to be receiving
9     the funds?
10  A  I'm sorry?
11  Q  Did you intend for the ambassador to believe that the
12     International Institute was receiving the funds?
13  A  I think my understanding at the time, that the funds
14     would be coming to the University of Michigan.
15  Q  But not to CPS?
16  A  No, no, that CPS was a part of the University of
17     Michigan, as was the International Institute.
18  Q  Okay. So that the money would be going to CPS instead
19     of the International Institute, that was your
20     understanding at the time of this letter?
21  A  Well, as of this letter.
22  Q  Yes. And was that something that Margaret Cone had
23     agreed to?
24  A  I don't recall so.
25  Q  And you did not ask her to agree to that change?

Page 179

1  A  Other than the exchanges we had over email.
2  Q  And in those exchanges, she did not send you an email
3     agreeing to --
4  A  Not to --
5  Q  -- that change?
6  A  -- my recollection.
7  Q  And you did not ask her to agree to that change in those
8     emails?
9  A  I would have to go back to the emails and see.
10  Q  So the University of Al-Azhar was to be the partner and
11     the provider of students for part of the program?
12  A  My understanding was that the University of Al-Azhar
13     would be providing students. There was no formal
14     indication to this effect, but I assumed that that's why
15     the UAE ambassador would be willing to fund it.
16     (Exhibit 19 was marked for identification.)
17  BY MR. JUCKNIESS:
18  Q  This is Exhibit 19, Jackson 256. Do you recall drafting
19     or editing this letter to Dr. Al-Tayyeb at Al-Azhar
20     University?
21  A  It looks like something that I may have drafted, I don't
22     recall it, but okay.
23  Q  You would have pulled this document off your computer?
24  A  Right.
25  Q  Yes?

Case 2:16-cv-11306-SFC-SDD ECF No. 133-1, PageID.4731 Filed 01/13/19 Page 29 of 37

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

Page 180

1 A Yes.
2 Q And this starts, "It is our great pleasure to extend
3 this memorandum of agreement and understanding between
4 the University of Michigan and Al-Azhar University, as
5 mutual partners in executing the World Leadership
6 Program."
7 Was there ever a memorandum of agreement and
8 understanding with Al-Azhar about --
9 A Not to my knowledge.
10 Q So this was prepared, but was not ultimately --
11 A I don't think so.
12 Q Not in this form?
13 A I don't think so.
14 Q As of December 8th, 2009, it says, "Professor Sherman
15 Jackson of the University of Michigan will oversee
16 operations at the University of Michigan."
17 Was that accurate?
18 A Yes.
19 Q And did you submit any draft of the letter that went to
20 Al-Tayyeb to anyone at the University of Michigan for
21 approval prior to sending it?
22 A Not to my recollection. I'm not sure this was even
23 sent.
24 COURT REPORTER: "I'm not sure"?
25 A I'm not sure this was even sent.

Page 181

1 (Exhibit 20 was marked for identification.)
2 BY MR. JUCKNIESS:
3 Q Exhibit 20 is a copy of the letter to Dr. Tayyeb at
4 Al-Azhar and this is dated December 14, 2009.
5 Do you remember participating in the preparation of
6 a letter that went to Tayyeb?
7 A I recall this vaguely, but I don't think I wrote this.
8 Q Okay.
9 A I'm not sure, but I just don't think. And I say that
10 because of the misspelling.
11 Q Okay. And this says again, "Professor Sherman Jackson
12 of the University of Michigan will oversee programming
13 and operations at the University of Michigan," do you
14 see that?
15 A Yes.
16 Q And that was accurate, was it not?
17 A Yes.
18 Q You received a copy of this letter, right?
19 A I'm not sure this letter was even sent. My signature is
20 not on it.
21 Q Okay. This says, "He will be joined in this regard by
22 Ms. Margaret Cone and Professor Mark Tessler,
23 Vice-Provost for International Affairs at the University
24 of Michigan."
25 Is there a reason that you wouldn't have wanted to

Page 182

1 make sure that CPS was somehow identified in this
2 letter?
3 A None that I can think of.
4 Q Shouldn't CPS have been identified as the home for the
5 project?
6 A Perhaps.
7 MR. BOURQUE: Object to the form.
8 Go ahead. You already answered.
9 BY MR. JUCKNIESS:
10 Q Why was this put on the International Institute
11 letterhead instead of CPS letterhead?
12 A I'm not sure.
13 Q Why not put it on LS&A letterhead?
14 A I'm not sure.
15 Q And as far as you're aware, this letter was not -- you
16 did not submit this letter for approval by anyone at the
17 University of Michigan?
18 A Not to my recollection, no.
19 Q Or at the International Institute?
20 A Well, Mark Tessler's.
21 Q Just Mark Tessler? Only Mark Tessler at the
22 International Institute?
23 A He's the director.
24 Q So it was your understanding that Mark could make
25 decisions on behalf of the International Institute?

Page 183

1 A That was my basic understanding.
2 Q Did you confirm that understanding with anyone?
3 A I did not.
4 Q Did Mark ever tell you that that was the case?
5 A I don't recall him ever stating that explicitly.
6 Q Did he imply it?
7 A That was my understanding.
8 Q Did he ever tell you, you know, the International
9 Institute, that he has authority to say what contracts
10 they'll enter into and which ones they wouldn't?
11 A I don't recall his ever saying that explicitly.
12 Q Anything similar?
13 A My understanding is that he was director of the
14 institute, and in that capacity, he would be in a
15 position to make those kinds of decisions.
16 (Exhibit 21 was marked for identification.)
17 BY MR. JUCKNIESS:
18 Q Exhibit 21 is a letter dated January 15th, 2010, to the
19 ambassador, Ambassador Otaiba, and this one was sent by
20 you, correct?
21 A I believe so.
22 Q Okay. And do you remember reviewing this document in
23 January?
24 A I don't know when, but I recall reviewing it because I
25 signed it.

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

Page 184

1  Q  Okay. And this, again, was to -- was providing wiring
2     instructions to wire the funds to CPS, correct?
3  A  Apparently, yes.
4  Q  It says in the second paragraph, it says, "We are
5     pleased to report that we have made significant progress
6     in our planning and in participant selection."
7        What was the significant progress made in the
8     planning and participant selection as of January 15,
9     2010?
10 A  Well, I guess my understanding would be that we had
11    found a home, we had begun to make arrangements for the
12    administration of the project, these are things that had
13    been worked on up to that time.
14 Q  And as far as finding a home, the home was found by Mark
15    Tessler suggesting CPS and you then suggesting CPS?
16 A  Umm -- yes.
17 Q  Anything else?
18 A  In terms of?
19 Q  Anything else that was done to -- by you to find a home
20    as part of the progress and planning?
21 A  Well, I tried to resolve all the issues that both Mark
22    Tessler and Ms. Cone had raised and move to agreeing
23    that the project would come to U of M.
24 Q  Okay. The next line says, We are now ready to commit to
25    a timeline and need to make reservations and travel

Page 185

1     plans for participation. Or "for the participants."
2        Had you done anything with respect to selecting
3     participants?
4  A  I don't recall.
5  Q  Was there any -- any timeline that had been submitted to
6     the University of Michigan at this point that had been
7     approved by either the International Institute or anyone
8     else?
9  A  Other than -- I don't recall the dates on all these
10    documents, but other than what Ms. Cone had submitted, I
11    don't recall any other timelines.
12 Q  Okay. The last sentence on the page says, "As Principal
13    Investigator on the project, Professor Sherman Jackson
14    will be responsible for directing the disbursement of
15    the funds from your contribution."
16       You were agreeing to be principal investigator,
17    correct?
18 A  Correct.
19 Q  And to be responsible for directing disbursements of the
20    funds?
21 A  Correct.
22 Q  And you understood that was to be in connection with
23    work constrained by the budget with reasonable
24    adjustments?
25 A  Um-hmm.

Page 186

1  Q  Yes?
2  A  Yes.
3  Q  The next line says, "This will be done in consultation
4     with Mark Tessler and Margaret Cone, who are
5     co-Principal Investigators."
6        And so that was accurate, was it not?
7  A  To my recollection, yes.
8  Q  And you intended to consult Mark Tessler and Margaret
9     Cone on those disbursements?
10 A  Yes.
11 Q  The next line, it says, "Furthermore, we want to assure
12    you that all project expenditures will be carefully
13    monitored according to the well-established financial
14    policies and procedures at the University of Michigan."
15       Did -- did -- so you agreed that the project
16    expenditures would be carefully monitored?
17 A  I agreed because that was my assumption of what would
18    happen if the project went to the International
19    Institute or CPS.
20 Q  So you assured the ambassador that all the project
21    expenditures will be carefully monitored according to
22    the University of Michigan policies and procedures?
23 A  That was my assumption, yes.
24 Q  But that was actually what you explicitly assured the
25    ambassador would happen?

Page 187

1  A  Yes.
2  Q  And did you ensure that that happened or did you rely on
3     Mark Tessler to do that?
4  A  I relied in part on Mark Tessler and in part on the fact
5     that I assumed that CPS, as a university entity, would
6     follow the instructions and the regulations that govern
7     these bodies within the university.
8  Q  And so you expected that others would carefully monitor
9     the financial policies and procedures for the
10    disbursements?
11 A  Yes.
12 Q  Any reason that this --
13       MR. BOURQUE: Do you need a break?
14       THE WITNESS: Just a bathroom break.
15 BY MR. JUCKNIESS:
16 Q  Certainly. Let me just ask one more question, which is
17    any reason -- or why you didn't you mention CPS in this
18    document?
19 A  I don't know.
20 Q  The document is on International Institute letterhead
21    and the signatures don't mention CPS. Why is that?
22 A  I don't know.
23       MR. JUCKNIESS: Okay.
24       VIDEOGRAPHER: The time is 1:58 p.m. We are off
25    the record.

Page 188

1    (Whereupon a break was taken.)
2    (Exhibit 22 was marked for identification.)
3        VIDEOGRAPHER: The time is 2:02 p.m. We are now on
4    the record.
5    BY MR. JUCKNIESS:
6    Q   Okay. I'm handing you what's been marked as Exhibit 22,
7    Bates number U-M Subpoena Response 2424 to 2426, an
8    email from Dave Howell to you dated February 16th, 2010,
9    that says, "Next week when you're in Ann Arbor we can
10   sit down and come up with a detailed budget that will
11   help you manage the WLP project."
12       And it was accurate, was it not, that you were
13   supposed to be managing the WLP project, or was that
14   inaccurate?
15  A   Well, it depends on your definition of managing.
16   Overseeing, is that the same as managing?
17  Q   Why were you talking with Dave Howell about coming up
18   with a detailed budget when you already had a budget
19   that had been agreed to?
20  A   Again, I -- the only thing that I can make of it is the
21   whole question of the overhead for CPS which Ms. Cone
22   and I had gone back and forth and there was a question
23   as to what it would be, so that raised budgetary
24   questions, that's my only recollection.
25  Q   Okay. That's the only reason -- why couldn't you just

Page 189

1    use the budget that had been prepared and agreed to
2    instead of creating a new one?
3   A   My understanding at the time or my understanding is that
4    that budget did not have any allotments for the
5    administrative costs at U of M.
6   Q   And that was the only adjustment that needed to be made?
7   A   To my recollection, although I don't know what else that
8    would have shaken up.
9   Q   Well, David Howell goes on and says, "Even before then,
10   though, I need some sort of reasonable draft budget just
11   to get the U-M account open so that the funds will be
12   available to you right away."
13       Was the budget that had been submitted and approved
14   not a reasonable draft budget?
15  A   Again, I don't know if -- I'm not quite sure about what
16   was going on on the DPS (sic) side, but I assume that
17   they could not -- there was no -- there was no allotment
18   in that budget for the administrative costs here, and
19   that's part of the arrangement that needed to be made,
20   the adjustment that needed to be made.
21  Q   So he says, "With that in mind, I created the draft
22   (temporary) budget, which I based on items from the
23   early budget you provided me previously."
24       So presumably, the budget that you provided him was
25   the one that had been approved by the ambassador?

Page 190

1   A   I assume so.
2   Q   Did you create some other budget that you gave to David
3    Howell?
4   A   I did not, not to my recollection.
5   Q   Okay. Why would Dave Howell think that was just an
6    early budget instead of the budget for the program that
7    had been approved --
8   A   Nothing that I can imagine, to me. I don't know, I
9    mean (inaudible) --
10       COURT REPORTER: You're going to have to speak up a
11   little.
12       THE WITNESS: I'm sorry.
13       COURT REPORTER: I'm sorry.
14       THE WITNESS: I'm sorry, I apologize. I just
15   have --.
16  A   I don't know. I don't know what Dave Howell had in
17   mind.
18  BY MR. JUCKNIESS:
19  Q   Did you tell him that there was an approved budget on
20   the program and that should be submitted?
21  A   I think he knew that.
22  Q   Okay. Did you take any steps --
23  A   I don't know.
24  Q   -- to make sure that he submitted that and had that
25   approved by the U of M?

Page 191

1   A   No.
2   Q   Did you just assume that he would do that?
3   A   I think what I assumed was that the -- the needed
4    adjustments would be made, and that would be the basis
5    upon which we would proceed.
6   Q   Is it consistent with university policy regarding
7    principal investigators for principal investigators to
8    just assume that things are going to get done and not
9    check?
10  A   I don't know.
11  Q   Do you remember reviewing the attached draft temporary
12   budget?
13  A   I don't remember reviewing this, but one thing that
14   sticks out at me is that it's 25 percent instead of 22,
15   so I don't know if this was something that was the basis
16   of a discussion or this was what was finally being
17   suggested.
18  Q   Okay.
19  A   I don't know --
20  Q   Yeah, here we've got the $17,500 per month number, do
21   you see that, on CPS fees?
22  A   Yes.
23  Q   And that was that -- the number that you were -- was
24   close to the number that was referred to in that memo
25   that you said was agreed to with the funder?

Page 192

1 A Um-hmm.

2 Q To be paid out at the beginning of each month, correct?

3 A I believe so.

4 Q Was it your expectation that CPS would receive $17,500

5 per month for each of the months all the way back to May

6 of 2009?

7 A I didn't have an expectation, per se. I assumed that

8 that overhead would be determined on some kind of shared

9 formula across the university.

10 Q CPS didn't do any work on the World Leadership Project

11 in May, June, July and August, September or October of

12 2009, correct?

13 A When did CPS exactly -- I don't recall the dates. I

14 don't recall when CPS came into the picture, so I can't

15 answer that question.

16 Q Did CPS do anything in the summer of 2009 regarding the

17 World Leadership Program?

18 A I don't recall.

19 Q So the fourth paragraph --

20 A I mean, not before -- not before CPS formally came into

21 the picture, I don't recall it doing any work on the

22 project.

23 Q When did CPS -- CPS formally came into the picture in

24 February of 2010, correct?

25 A I believe that's probably correct, but the record would

Page 193

1 show that, but --

2 Q Okay. The next paragraph says, "Also, to open the

3 account I need to provide the level of proposed effort

4 that the leadership (you as PI, Mark as co-PI) will be

5 devoting to the project in the first year."

6 That has to do with the effort reporting, correct?

7 A Um-hmm, um-hmm.

8 Q Yes?

9 A Yes.

10 Q And did you give him the numbers for the proposed

11 effort?

12 A I don't recall.

13 Q Well, we know that the numbers on your effort reporting

14 were 75 percent for May, June -- for June, July and

15 August of 2009 and then additional effort in June, July

16 and August of 2010 and no other effort, correct, do you

17 remember that?

18 A No.

19 Q You do not. What was the proposed effort that you sent

20 back to Dave Howell?

21 A I don't recall.

22 Q Did you respond?

23 A I assume I did, but I don't recall what that response

24 was.

25 (Exhibit 23 was marked for identification.)

Page 194

1 BY MR. JUCKNIESS:

2 Q Exhibit 23 is an email from Dave Howell to you

3 forwarding the Proposal Approval Form that U-M requires

4 to open an account.

5 A Um-hmm.

6 Q Does this refresh your recollection that you received a

7 Proposal Approval Form that was required to open an

8 account for the WLP?

9 A No, it doesn't, but that doesn't mean that I didn't

10 receive it.

11 Q Okay. And in the comments, it says, "Hi Sherman." This

12 is about halfway down. "Hi Sherman. This is the

13 Proposal Approval Form that U-M requires to open an

14 account for the WLP."

15 And you understand that to mean --

16 A Yes.

17 Q You understood that?

18 A I understand that.

19 Q You understood at the time that a Proposal Approval Form

20 was required to open the account?

21 A Well, if you're asking if I understood this sentence at

22 the time or if I --

23 Q Yeah.

24 A -- understood that -- I understood the sentence at the

25 time.

Page 195

1 Q Okay. And it says, "It contains the preliminary budget

2 and other items that we discussed."

3 Was there a preliminary budget for the project or

4 was there an approved budget?

5 A I don't know what he means by preliminary budget, other

6 than, again, perhaps the budget that was submitted to

7 Ambassador Otaiba.

8 Q But that was the approved budget; he may be thinking of

9 it as the preliminary budget?

10 A Yes.

11 Q You thought of it as the approved budget?

12 A Basically.

13 Q So it says, "Can you please click on the link in this

14 document and, as the PI, approve the PAF (you will have

15 to log in to do so)?"

16 You understood then that you had to approve the PAF

17 as the PI, correct?

18 A Yes.

19 Q And you did so, is that correct?

20 A I don't recollect, but I assume.

21 Q You had an obligation to do so as the principal

22 investigator, correct?

23 A I assume.

24 Q You don't know? Would you have tried to find out if you

25 had an obligation or not?

MARGARET CONE vs MARK TESSLER et al                                    Job 5380
Sherman Jackson on 10/09/2017 Non-Confidential                      Pages 196..199

Page 196

1  A   I mean, I assumed that, again, DPS (sic), as the
2      International Institute, would be proceeding on the
3      basis of university policy, so if this was indicated to
4      me, I would understand that I had an obligation to do
5      that.
6  Q   Okay. So based on this document, you knew at the time
7      that you had an obligation to do that, correct?
8  A   To -- obligation to do what, to fill out --
9  Q   To approve the PAF?
10 A   I assume.
11 Q   When you say you assume, do you mean yes?
12 A   Yes, I assume.
13 Q   You mean yes, you understood it, or you mean you don't
14     recall one way or another whether or not you understood
15     it?
16 A   I assume that I understood it at the time. I don't
17     recall what my state of mind was at the time.
18 Q   Okay. It says, "At the same time, you will probably
19     have to indicate that you have no conflict of interest
20     on the project."
21         Did you have any conflict of interest on the
22     project?
23 A   Not to my recollection.
24 Q   Would a conflict of commitment have constituted a
25     conflict of interest that you would have had to report

Page 197

1      as principal investigator?
2  A   I can't imagine any conflict of commitment with the
3      project.
4  Q   If you weren't going to be available for the project,
5      would that be a conflict of commitment?
6  A   Not necessarily.
7  Q   So the email at the top says, "Hi Sherman. Just adding
8      an 'Urgent' at the beginning of this email, as we had
9      agreed, as it requires immediate attention."
10         At some point did you reach an agreement with Dave
11     Howell where he put "Urgent" on an email if it needed
12     your immediate attention?
13 A   I don't recall that.
14 Q   Okay. And he said, "Once you do the below we should be
15     able to get your account opened and funds transferred
16     into it."
17         And did you have an understanding at that time of
18     where the funds were going?
19 A   I assume it would be going to DPS (sic). That was the
20     whole point of --
21 Q   CPS?
22 A   CPS, I'm sorry.
23 Q   Did you interact at all with Laurie Winslow?
24 A   I don't recall her.
25         (Exhibit 24 was marked for identification.)

Page 198

1  BY MR. JUCKNIESS:
2  Q   Okay. Exhibit 24, this looks like a follow-up for the
3      project approval? This is Laurie Winslow -- or I'm
4      sorry -- Dave Howell forwarding to you and Laurie
5      Winslow the project award notice. And the email from
6      Dave says, "Hi Sherman. The below means the CPS account
7      has been established for the WLP."
8         So this confirms what you said before, that you
9      understood it was the CPS account that was being
10     established?
11 A   Yes.
12 Q   And the -- does this refresh your recollection at all as
13     to your certification of the project approval form?
14 A   No, it doesn't.
15 Q   At the time of the project award notice or the project
16     approval form that we previously discussed, did you
17     expect or intend to have CPS paid $15,000 a month for
18     every month prior to February 2010 all the way back to
19     May of 2009?
20 A   I would not say that that was my understanding now. I
21     don't know what the conversations -- (inaudible) the
22     conversations --
23         COURT REPORTER: You're going to have to speak up a
24     little, please. I'm sorry.
25 A   I don't know how the conversations -- I don't recall how

Page 199

1      the conversations proceeded at the time. But I --
2  BY MR. JUCKNIESS:
3  Q   Can you tell me if CPS, can you identify for me any
4      services that CPS provided in May of 2009 to WLP?
5  A   May 2009. I don't believe I can.
6  Q   Certainly not $15,000 worth of services in May of 2009?
7         MR. BOURQUE: Is that a question?
8         MR. JUCKNIESS: Yeah.
9  A   I don't know.
10 BY MR. JUCKNIESS:
11 Q   Were you actively working with CPS in -- during May,
12     June or July of 2009?
13 A   2009. I don't recall. Again, my relation with CPS
14     began when I was introduced to them by Mark Tessler. I
15     don't know, I don't recall when that was.
16 Q   Well, we saw that email from Nancy Burns that said nice
17     to meet you last Friday and that was November 4th, so
18     sometime around there was your first meeting --
19 A   Yeah, so I don't -- sometime around there, I assume,
20     yeah.
21 Q   So CPS to your understanding didn't do any work on the
22     World Leadership Project prior to either the end of
23     October, beginning --
24 A   I don't recollect that.
25 Q   You don't recollect that they did --

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

Page 200

1  A  **Right.**
2  Q  **-- is that correct?**
3  A  **Yes, correct.**
4     (Exhibit 25 was marked for identification.)
5  BY MR. JUCKNIESS:
6  Q  Exhibit 25 is an email from Mark Tessler to Ambassador
7     Otaiba and copied to you and Margaret Cone. Do you
8     recall communicating or being part of a communication
9     with Ambassador Otaiba in early March of 2010?
10 A  I don't recall, but I don't deny.
11 Q  Okay. It says, "Both Professor Jackson and I have been
12    traveling."
13    Do you remember what your travel schedule was in
14    early 2010?
15 A  I do not.
16 Q  It says, "Planning for the program is going very well,
17    and we look forward to keeping in touch as things
18    continue to move forward."
19    What planning had been done by March 3rd, 2010, if
20    you recall?
21 A  I don't recall exactly, but I assume that the issues of
22    housing and visas and travel, students were being
23    selected, I assume. I don't --
24 Q  Well, the project had just been approved as of
25    Exhibit 24, February 26th --

Page 202

1  Q  Exhibit 26, U-M Subpoena Response 0249 to 251. This is
2     a chain of emails that you were included on, and you'll
3     see in the second message on the first page, Friday,
4     January 15th, from Mark Tessler to Dave Howell and to
5     you, saying, "Hi Dave. The letter looks good. What do
6     you (and especially Sherman) think about adding the
7     highlighted sentence below to the first paragraph on
8     page two. Thanks."
9     And it's unclear what's actually highlighted from
10    this copy, but underneath it says, "As Principal
11    Investigator on the project, Professor Sherman Jackson
12    will be responsible for directing the disbursements of
13    funds from your contribution. This will be done in
14    consultation with Mark Tessler and Margaret Cone, who
15    are co-Principal Investigators. Furthermore, we want to
16    assure you all project expenditures will be carefully
17    monitored according to the well-established," and
18    question mark.
19    Do you remember what he was suggesting adding or
20    why?
21 A  I do not.
22 Q  Language like that was ultimately included in the
23    letter, do you recall?
24 A  I think so.
25    MR. BOURQUE: Finished with that one?

Page 201

1  A  Um-hmm.
2  Q  -- correct?
3  A  Yes. If that's what it says.
4  Q  Yes. Well, it says it's a project award notice,
5     so -- and that's dated 2/26, so that was the date -- the
6     date of official approval?
7  A  Yeah, but the date of official approval does not
8     necessarily correspond with the date on which work for
9     the project was being undertaken.
10 Q  Okay. Okay. And --.
11    What sort of records were you keeping regularly
12    regarding the project preparations and plan?
13 A  I basically relied on my correspondences with the
14    various parties involved in the project. I didn't keep
15    a separate record.
16 Q  So just the email correspondence that you --
17 A  Email correspondence, the whatever letters were sent.
18    And of course, I have a recollection of certain phone
19    conversations.
20    (Exhibit 26 was marked for identification.)
21 BY MR. JUCKNIESS:
22 Q  Exhibit 6, U-M Subpoena Response --
23    MR. BOURQUE: 26.
24    MR. JUCKNIESS: Thank you.
25 BY MR. JUCKNIESS:

Page 203

1     MR. JUCKNIESS: Yes.
2     (Exhibit 27 was marked for identification.)
3  BY MR. JUCKNIESS:
4  Q  Exhibit 27, it's a collection of documents marked
5     Jackson 265 to 278, so I take it that these were also
6     pulled off your computer?
7  A  Yes.
8  Q  And I believe that these are notes created by, if you
9     turn to the second -- or the third page, by Raquel
10    Ukeles, whose CV appears on that page?
11 A  Um-hmm.
12 Q  And she created these notes and forwarded them to you in
13    connection with the work that was being done?
14 A  I think so. I could not confirm that positively, but I
15    think so.
16 Q  You didn't prepare documents --
17 A  I don't think so.
18 Q  -- like this?
19 A  I'm not -- I don't think I did.
20 Q  And this shows a phone meeting on March 9th, 2010?
21 A  Um-hmm.
22 Q  Did you attend that meeting?
23 A  Yes, I think I did.
24 Q  Okay. And then if you turn to 272, this says, "Phone
25    meeting with Sherman Jackson," March 3rd, 2010?

Page 240

1  Q  So you didn't agree?
2  A  I acquiesced.
3  Q  What efforts were made to move the project to a -- to
4      either a different department or to have a different PI
5      on your behalf?
6  A  I don't know of any.
7  Q  You didn't take any?
8  A  I don't know of any.  No, I didn't take any.
9  Q  You didn't take any.  You just said the project should
10     just -- should move or you just said Margaret Cone says
11     the project should move, and therefore, it should?
12 A  I didn't know of any other entity within the U of M that
13     would house and administer the project.
14 Q  Did you get approval from the sponsor prior to
15     withdrawing from the project?
16 A  I did not get that.
17 Q  Did Mark Tessler get that?
18 A  Approval?  I think we notified the sponsor, but I don't
19     know about approval.
20 Q  You didn't get approval prior to withdrawing, correct?
21 A  I don't think -- no.
22 Q  Did you get approval from anyone at U of M --
23 A  No.
24 Q  -- before withdrawing?
25 A  No.

Page 241

1  Q  Did you seek approval from anyone at LS&A or the law
2      school?
3  A  No.
4  Q  Anyone at International Institute?
5  A  No.
6  Q  Anyone at CPS other than Mark Tessler?
7  A  I didn't seek it, but no, from Mark Tessler.
8  Q  As PI, did you have the obligation to get a project
9      award change created in connection with that?
10        MR. BOURQUE:  Object --
11 A  I don't know.
12        MR. BOURQUE:  -- to the legal conclusion.
13        Go ahead.
14 A  I don't know.
15 BY MR. JUCKNIESS:
16 Q  Did you try to get an official project award change?
17 A  No.
18 Q  Did you expect Mark Tessler to take care of any policies
19     and procedures that needed to be taken care of in
20     connection with withdrawing from the program?
21 A  I didn't recognize that obligation at the time.
22 Q  Did you expect Mark Tessler to deal with any obligations
23     that you weren't recognizing?
24 A  No, I didn't expect him to deal with it.  I assumed that
25     Mark Tessler would know that there were specific

Page 242

1      obligations that accrued to that decision.
2  Q  And did he -- and he did not tell you at the time
3      that --
4  A  Not to my recollection.
5  Q  -- he -- he didn't tell you that you needed to get a
6      project approval change?
7  A  Not to my recollection.
8  Q  Or that you would have needed approval from the sponsor
9      to withdraw?
10 A  Not to my recollection.
11 Q  And you didn't think you needed approval from the
12     sponsor to withdraw?
13 A  Well, I just wasn't aware of any such obligation.
14 Q  If you had thought there was such an obligation, you
15     would have done it, correct?
16 A  If there was a -- if I had known there was an
17     obligation, yes, I probably would have done it.
18 Q  And so from your perspective, you had no obligation to
19     get an agreement or approval from the ambassador before
20     withdrawing?
21 A  I was unaware of any obligation to do so.
22     (Exhibit 35 was marked for identification.)
23 BY MR. JUCKNIESS:
24 Q  In front of you is Exhibit 35.  And at the bottom is an
25     email from Dave Howell to you and Sherman Jackson and

Page 243

1      that's dated March 29th.  And in the second paragraph,
2      it says, We've already provided what we can in terms of
3      the direct -- the indirect --
4  A  The second paragraph?
5  Q  Yes, sorry, the second paragraph, right here.
6  A  Aha, yes.
7  Q  "We've already provided what we can in terms of the
8      indirect cost questions that Margaret has, in my email
9      to you on Wednesday March 24th at 12:23.  So I'll assume
10     that you'll talk to Margaret about it."
11        And so March 29th, sometime thereafter, do you
12     recall having a discussion with Margaret about the
13     indirect cost questions?
14 A  I don't recall that discussion.
15 Q  And you don't recall any expressed agreement with
16     Margaret about indirect costs?
17 A  I don't recall that discussion.
18 Q  And you don't recall any agreement regarding --
19 A  I don't recall the discussion, whether it resulted in
20     agreement or disagreement.
21 Q  Okay.  And you didn't memorialize any agreement in
22     writing --
23 A  Not to --
24 Q  -- regarding indirect costs?
25 A  Not to my recollection.

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

Page 244

1 Q Did you -- do you recall informing Dave Howell that you
2 reached an agreement after that phone call?
3 A I don't recall.
4 Q The last paragraph there says, "Perhaps related, as I
5 mentioned to you recently, Laurie and I are working on a
6 draft budget that incorporates what information and
7 expenses we have so far in regards to the WLP budget."
8 So were you working with them on creating a new
9 budget?
10 A Not to my recollection.
11 Q Okay. So what was your understanding as to why they
12 were working on a draft budget when you already had a
13 budget?
14 A I'm not sure.
15 Q You already had an approved budget for the program at
16 that time?
17 A I -- yes, but I assume, again, because that budget
18 didn't include U of M administrative costs, that this is
19 part of that.
20 Q Do you recall there being problems with the visas and
21 the J1s and what was submitted?
22 A Vaguely, yes. I mean, I recall the problem was huge. I
23 don't know about the details.
24 (Exhibit 36 was marked for identification.)
25 BY MR. JUCKNIESS:

Page 245

1 Q Exhibit 36, U-M Supplement Subpoena Response 3737 to
2 3739. This is a chain that starts off with an email
3 dated March 28th, 2010. And actually, let me have you
4 turn first to the earlier email on the second page where
5 you wrote on Saturday, March 27th, to Dave Howell, "Dear
6 Dave: I just got the email from Margaret in which she
7 indicated that she did not need the letters of
8 invitation but the actual J1 applications, so that she
9 could check them for mistakes before they enter the
10 final process. It was my understandings both last night
11 and earlier this afternoon that that is what you had
12 sent me, which I passed along to Margaret, only to find
13 out upon reviewing the actual file that nothing but the
14 letter of invitation were included. Dave, this is
15 precisely the kind of thing that undermines trust and
16 causes all kinds of problems, not to mention putting me
17 in a bad light."
18 So you -- it was your opinion as of, you know, late
19 March that there were -- you had already identified the
20 kinds of things like this that were undermining trust
21 and causing problems with the World Leadership Program?
22 A No, I wouldn't say that. I would say that this
23 particular problem would be of the genre that would
24 erode trust.
25 Q And put you in a bad light?

Page 246

1 A Put me in a bad light in light of the exchanges
2 that we were having in which I was trying to find ways
3 of mitigating the tensions between Margaret
4 and -- Margaret -- Margaret Cone and Dave Howell and
5 CPS.
6 Q And you thought that she was expecting too much?
7 A Not a matter of too much. I thought that in some ways,
8 in some ways, the perception was Ms. Cone had gotten
9 the -- the understanding that people were her personal
10 employees and that she had no appreciation for their own
11 professional expertise and the manner in which they went
12 about doing things.
13 Q But Dave was making mistakes and was putting you in a
14 bad light?
15 A Well, Dave made a mistake here, and I said that this
16 kind of mistake, given that I have tried to assure
17 Ms. Cone that, you know, we would be addressing issues
18 in a manner that would be more to her satisfaction, this
19 kind of mistake would put me in a bad light.
20 Q And in fact, at least with respect to this, you went on
21 after saying that this would put you in a bad light, you
22 went on to say, "I do not think that it is too much for
23 Margaret to expect that when I tell her that I have
24 handled something, that it is actually handled."
25 And that was the thing that Dave had failed to

Page 247

1 handle, right?
2 A Apparently in that particular situation, yes.
3 Q And then you go on to say, "Clearly, we did not ask for
4 the letters but for the J1 applications. I rely on you,
5 as you know, to follow through with the requests I make
6 and was confident that that is what you had done."
7 So you were relying on David, but at least in this
8 instance, he hadn't followed through?
9 A In this instance, apparently, he had not.
10 Q And this wasn't the first time that he hadn't followed
11 through on something, was it?
12 A Well, I will say this wasn't the first time that
13 Ms. Cone had complained about something. I would not
14 say necessarily that it was the first -- that it was not
15 the first time he had followed through.
16 Q If this conduct was putting you in a bad light, do you
17 think it was also putting the World Leadership Program
18 in a bad light?
19 A I don't think so. I don't know who would -- who else
20 would have known about this kind of a problem.
21 Q Well, World Leadership, she is part of the World
22 A Well, World Leadership, she is part of the World
23 Leadership, no?
24 Q Well, what about the people she was dealing with in
25 Egypt on the -- on the visas?

MARGARET CONE vs MARK TESSLER et al
Sherman Jackson on 10/09/2017 Non-Confidential

Page 288

1  "we," meaning CPS, I assume, "are on the verge of taking
2  the initiative on this," that is, moving the project
3  elsewhere.
4     Had you talked to them about that?
5  A  No, I did -- I don't -- I don't read that statement in
6  that way, but no, I had no understanding that there was
7  anything afoot in that regard.
8  Q  You were getting ready to spring that on -- on the
9  program at that time?
10 A  Who's that?
11 Q  Any of you, moving the program. We're going to move it,
12 sorry?
13 A  I don't get your -- your question. Who is going to move
14 it?
15 Q  Well, that the PI would move it or that CPS would move
16 it or say we're withdrawing?
17 A  I don't -- I don't -- I don't follow your -- your lead
18 here, I don't -- as I said, I don't recall any
19 conversations about moving the -- moving the project.
20 Q  Yeah, okay. So Mark was keeping that to himself and
21 wasn't sharing that with you?
22 A  Again, I mean --
23 Q  That they're on the verge of taking the initiative on
24 this?
25 A  On -- on -- well, this is not clear to me.

Page 290

1  leadership, I was surprised to learn from you that
2  Sherman will be overseas during part of the time the
3  group will be in Ann Arbor."
4     So first of all, you didn't tell Mark that you were
5  going to be gone for part of the time that the group
6  would be in Ann Arbor?
7  A  I don't recall telling him that.
8  Q  But he was surprised about that, did he express that to
9  you?
10 A  I don't recall his expressing that to me.
11 Q  Okay. He expected you to be there, right?
12 A  As he said, he was surprised.
13 Q  He says, "I also don't know to what extent he has lined
14 up instructors and American students for the non-English
15 language part of the program."
16    To what extent had you lined up instructors and
17 American students?
18 A  Well, again, we had the meetings, the phone meetings,
19 and again, Ms. Cone had been basically taking the lead
20 on that, and much of that was agreed upon in those
21 meetings.
22 Q  Okay. He goes on to say, "I hope he has made whatever
23 arrangements are necessary and that things are falling
24 into place."
25    That's because that was your responsibility and

Page 289

1  Q  Okay. He says, "I am confident that CPS is more than
2  ready to see the project move elsewhere - in fact we are
3  on the verge of taking the initiative on this."
4  A  Oh, okay. Well, no, I was not aware of that, I don't
5  recall anything in that regard.
6  Q  He was keeping that to himself?
7  A  I was not aware of it.
8  Q  Okay.
9  A  I don't recall any conversation about that.
10    (Exhibit 45 was marked for identification.)
11 BY MR. JUCKNIESS:
12 Q  Okay. Exhibit 45, an email from 4/14 from Mark to
13 Margaret. And first of all, you'll see that there's an
14 email about CPS, and about four lines into
15 that -- that -- or paragraph, the third paragraph about
16 CPS, and about four lines in, it says, "I was told by
17 CPS today that Sherman did not forward to CPS for almost
18 a month some of the reimbursement requests you sent
19 him."
20    Do you remember that being a problem with the
21 program that was expressed to you?
22 A  Again, I don't recall that, but that's the same thing
23 that's come up in prior documents.
24 Q  So Mark Tessler also writes in "Leadership" at the
25 bottom, he says, "As per our earlier emails about

Page 291

1  Margaret's responsibility and not his?
2  A  Again, it wasn't clear whose responsibility it was, and
3  there were just general understandings that came out of
4  conference calls and meetings we had.
5  Q  As PI, it was your responsibility to figure out whose
6  responsibility it was, right?
7  A  Well, again, as I said, I mean, that was part of the
8  problem, the lines of demarcation between the PI and the
9  co-PIs was not always clear.
10 Q  He says, "No information has been shared with me, but
11 that's fine, since it's not my responsibility."
12    You weren't sharing any information with Mark about
13 preparations?
14 A  I think that those -- the preparations with regard to
15 faculty and students, those conversations were primarily
16 between myself, Ms. Cone, and others who had joined that
17 conversation, Raquel Ukeles and others.
18 Q  Okay. He goes on, Tessler goes on to say, "I am not in
19 a position to be more deeply involved myself."
20    Is that because he was on sabbatical?
21 A  I don't know.
22    MR. BOURQUE: Where was that?
23    MR. JUCKNIESS: The first paragraph, second page.
24 Or second paragraph, second page.
25    (Exhibit 46 was marked for identification.)